EXHIBIT A



## Overview

In Lux Research ("ILR") was engaged by Law Offices of Juli Haller, which represents Connie Meggs, and by Fischer & Putzi, P.A, which represents Thomas Edward Caldwell, to investigate whether the qualified jury pool for the United States District Court for the District of Columbia ("DC Community") harbors bias prejudicial to defendants, such as Meggs and Caldwell, who are facing criminal prosecution related to incidents at the U.S. Capitol in Washington, D.C., on January 6, 2021[1] ("Defendants"). ILR was asked to design and conduct a study that would meet the following objectives:

1.  Identify any specific themes of bias.

2.  Gauge the intensity of any prejudicial bias detected.

3.  Determine whether the rates and intensity of any prejudicial bias discovered within the DC Community are unique to the DC Community.

4.  Ascertain whether respondents who indicate harboring bias against Defendants report doubt in their ability to be fair and impartial jurors for Defendants.

To achieve these objectives, ILR impartially conducted a well-conceived community attitude survey ("CAS") of the DC Community and, concurrently, of the qualified jury pools in three additional federal districts ("Test Areas.")[2]. Over 1500 potential jurors were interviewed, yielding over 350 responses from each Test Area. Respondents were randomly selected from master lists of potential jurors in each Test Area created in the same manner master jury wheels for the federal districts are created. The accurately recorded results from the four Test Areas are presented side-by-side for this multi-district comparative study ("Study") so that the rate and intensity of bias in the DC Community can be viewed in comparison to the other Test Areas. This Study was guided by the American Society of Trial Consultants' Professional Standards for Venue Surveys[3] and is comprised of four qualified[4] opinion surveys to aid the Court in weighing the totality of circumstances, should it be asked to consider a motion to transfer venue or other questions concerning pretrial juror bias.

---

[1] Connie Meggs is a defendant in case 1:21-cr-00028-APM in D.D.C.; Thomas Edward Caldwell is a defendant in case 1:22-cr-00015-APM in D.D.C. Both cases are among multiple others listed on the U.S. Department of Justice website as "Capitol Breach Cases." https://www.justice.gov/usao-dc/capitol-breach-cases

[2] The United States District Court for the District of Columbia, the United States District Court for the Middle District of Florida - Ocala Division, the United States District Court for the Eastern District of North Carolina, and the United States District Court for the Eastern District of Virginia.

[3] https://www.astcweb.org/professional_code

[4] "'Qualified' means only that the survey be well-conceived, impartially conducted, and accurately recorded," see ABA Standards for Criminal Justice: Fair Trial and Free Press Standard 8-3.3. Change of venue or continuance (1992). "A survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party," Corona v. Superior Court, 24 Cal. App. 3d 872 (1972).

## Key Findings

Results from the Study show that the DC Community's attitude is unique among the Test Areas - and is decidedly negative toward Defendants. While the Test Areas differ from each other in geographic location, demographic composition and political party alignment, the three other Test Areas produced remarkably similar results on most questions in the survey, with the DC Community standing apart. By measure, the DC Community attitude toward the Events of January 6th and toward **all** defendants associated with those events proves to be an outlier. The response distributions from the DC Community deviate considerably from both the medians and means of the response distributions throughout the Study[5].

Key differences between the DC Community and other Test Areas fall into at least five general categories: (1) prejudgment, (2) personal impact and perceived victimization, (3) exposure to information related to the case(s) [6], (4) recognition and disclosure of bias, and (5) eligible population size. Key findings from each category are detailed below:

### I.   Prejudicial Prejudgment

The Study shows that the DC Community is saturated with potential jurors who harbor actual bias against Defendants. In total, **91% of DC Community** respondents who answered all of the prejudgment test questions admit making **at least one prejudicial prejudgment** on issues related to the case(s), while the other Test Areas admit doing so at rates from 49% to 63%.[7] This bias is not only more prevalent in the DC Community, but it is also more intense. The DC Community also admits making more than one prejudicial prejudgment at a much higher rate than respondents from the other Test Areas. In fact, **30% of DC Community** respondents admit that they **have already made every prejudicial prejudgment tested for in the survey** – double the rate of the next highest Test Area[8].

Of the four questions used to test for prejudicial prejudgment, the DC Community indicates prejudging decisively against Defendants on each question, disclosing that it is more likely to find Defendants "guilty" than "not guilty" and opining that the Events of January 6th were criminal in nature, that **all** who entered the U.S. Capitol planned in advance to do so, and that **all** of the Events of January 6th were racially motivated. The three other Test Areas indicated much lower – and more similar - rates of prejudicial prejudgment[9]:

---

[5] Appendix B - Frequency Distribution Tables
[6] Specifically, case 1:21-cr-00028-APM in D.D.C. as to Meggs and case 1:22-cr-00015-APM in D.D.C. as to Caldwell, and, generally, any other similar case, including those listed on the U.S. Department of Justice website as "Capitol Breach Cases." https://www.justice.gov/usao-dc/capitol-breach-cases.

[7] Figure 2a.
[8] Figure 2d.
[9] Figure 1a-d.

- Q3. **72% of DC Community** respondents said that they are **likely to find Defendants guilty** – even when given the choice, "It is too early to decide." The median in the Study was 48%.

- Q5. 85% of the DC Community characterizes the Events of January 6th as acts that are criminal in nature (insurrection, attack or riot), even when given options to reserve judgment on that question. The median in the Study was 54%.

- Q6. 71% of the DC Community believes that **all** who entered the U.S. Capitol without authorization planned in advance to do so, even when offered options to reserve judgment on that question. The median in the Study was 49%.

- Q9. Over 40% of the DC Community stated they believe **all** the Events of January 6th were racially motivated, even when offered options to reserve judgment on that question. The median in the Study was 20%.

Respondents in all Test Areas overwhelmingly rejected answer choices that distinguish individual circumstances from the "group" of all people allegedly involved with the Events of January 6th, opting instead to generalize opinions to the group.

- Q6. asked respondents if they believe that individuals who entered the U.S. Capitol on January 6, 2021, had planned to do so in advance or if they had decided that day to do it. Only 12%-16% of respondents from the Test Areas selected the answer that indicates they would consider this question on a case-by-case basis ("Some planned to do so in advance, and some decided that day."). Another 4-9% said that they don't know. The remaining respondents, around 80% in each Test Area, held a single opinion about everyone included in the group.[10]

- Q9. asked respondents if they believe that the Events of January 6th were racially motivated. 3-5% in each Test Area said they did not know, while 8%-22% said, "Some were, and some weren't." The remaining 76%-89% from each Test Area responded to the question with a single opinion about the motivation for **all**, rejecting the option to acknowledge differences among the group.[11]

- Q3. asked respondents if they are more likely to find a defendant charged with crimes related to the Events of January 6th "guilty" or "not guilty" OR if it is "too early to decide." Only 18%-25% across the Test Areas think that it was too early to decide. Across the areas, 75%-82% of respondents proceeded to select how they are likely to vote if selected as a juror for such a defendant – without any details on the identity of the defendant, the circumstances of the case, the evidence or a defense.[12] Lacking any information about the hypothetical

---

[10] Figure 1c.
[11] Figure 1d.
[12] Figure 1a.

defendants, other than that they would be tried in relation to the Events of January 6th, the 75%-82% of respondents who selected anything other than "too early to decide" must have formed their opinions based on conclusions they had made about **all** defendants.

The results detailed above show that bias against individual defendants can be reasonably imputed from bias against the group of **all** defendants charged with crimes related to the Events of January 6th. Similarly, information about any one Defendant is likely to be generalized to all Defendants. All Test Areas indicate generalizing opinions about the Events of January 6th and Defendants, but the DC Community has generalized almost entirely negative opinions when doing so. The other Test Areas generalize but do so with mixed opinions, as demonstrated in their responses.

## II.    Personal Impact and Perceived Victimization

The DC Community reports a unique association with Defendants and their case(s). Members of the DC Community claim high levels of personal impact and perceived victimization caused by the Events of January 6th, including feeling an increased concern for safety, experiencing restrictions on their free movement, identifying as a member of a group they believe was targeted, and by being "personally affected" by the Events of January 6th. In total, 82% of DC Community respondents who answered all of the personal impact and victimization questions reported feeling personally affected, being inconvenienced, having their free movement restricted, feeling increased concern for safety, or identifying with a group they believe was targeted by events at issue in the case(s).

One of the questions used to test for prejudgment, Q9., revealed a unique position the DC Community finds itself in with regards to Defendants and their case(s); 62% of the DC Community feels that some or all of events at issue were racially motivated[13], and most of the respondents who feel this way are non-white. 44% of the DC Community is a member of a group or class that they believe was targeted by events at issue in the case(s). In comparison, only 6%-18% of the potential jurors in the other Test Areas are expected to view the case(s) from this perspective.[14]

## III.    Exposure to Information Related to the Case(s)

As noted above, most potential jurors have generalized opinions about all Defendants. This phenomenon could make it necessary to find jurors who have not formed any opinions

---

[13] Figure 1d.

[14] Figure 3d.

about the Events of January 6th or about any Defendants. Exposure to information about one Defendant may cause an opinion about another. Almost every potential respondent in all Test Areas was aware of the Events[15], but the other Test Areas had higher rates of potential jurors who are not regularly exposed to information. Almost three-quarters of the DC Community sees, reads or hears about the Events of January 6th at least several times per week, with roughly one-third of the DC Community exposed 10 or more times per week. This exposure comes from the media, local leaders and others from the community. Respondents from the three other Test Areas are more likely to avoid exposure to information from these sources. Compared to the DC Community, FL has 2.85x the rate of respondents exposed "never or almost never." NC has 2.65x the rate, and the VA community has 2.77x the rate of "never or almost never" exposed potential jurors available in comparison to the DC Community.[16]

## IV.    Recognition and Disclosure of Bias

The DC Community claims a greater capacity than the other Test Areas to be fair and impartial jurors for defendants charged with crimes related to the Events of January 6th. While promising on its face, this representation may actually indicate a failure to recognize or admit threats to fairness and impartiality. The same panel of respondents from the DC Community that overwhelmingly claims they could be fair and impartial also revealed making prejudicial prejudgments at a much higher rate and with more intensity than any other Test Area. 91% of DC Community respondents admitted making at least one prejudicial prejudgment on issues of the case(s), yet 70% of that panel later claimed they could be fair and impartial jurors.[18] Respondents in the DC Community demonstrate an inability to identify or unwillingness to report previously disclosed bias when asked if they could be a fair and impartial juror for a "January 6th" defendant.

## V.    Population

The results of this study are reported as frequencies, or rates of response, from each Test Area. To understand the conditions these rates indicate in the Test Area, the rates found in this Study can be applied to the eligible population number of the Test Area to calculate the estimated yield of potential jurors with that result. For example, using official voter registration numbers provided by election authorities[19] as a lower estimate of eligible population and the

---

[15] Appendix B - Frequency Distribution Tables at p. 1
[16] Figure 6.
[17] Figure 5.
[18] FL Middle county list: https://www.flmd.uscourts.gov/divisions
FL Middle voter statistics:
https://www.dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-by-county-and-party/
NC Eastern county list: http://www.nced.uscourts.gov/counties/Default.aspx
NC Eastern voter statistics:  https://vt.ncsbe.gov/RegStat/
VA Eastern county list: https://www.vaed.uscourts.gov/eastern-district-virginia-jurisdiction
VA Eastern voter statistics: https://www.elections.virginia.gov/resultsreports/registration-statistics/2022-registration-statistics/

Census population numbers[19] as a higher estimate, a range of predicted yield can be calculated. High rates of bias in a smaller pool of eligible jurors, such as in the DC Community, will yield fewer acceptable jurors than the same rates of bias in a larger pool. Table 1. shows the results from several questions in the Study as applied to the range of eligible juror population estimates for each Test Area.

---

[19] https://www.census.gov/data/tables/time-series/demo/popest/2020s-counties-total.html



## Table 1.

A. Number of potential jurors who have **not made a prejudicial prejudgment** against Defendants.

| Test Area | Registered voters in federal district | Census population in federal district | Percent that have not made a prejudicial prejudgment | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 8.89% | 42,962 | 61,301 |
| FL | 7,505,432 | 10,908,580 | 50.65% | 3,801,501 | 5,525,196 |
| NC | 2,786,323 | 4,056,244 | 38.70% | 1,078,307 | 1,569,766 |
| VA | 4,286,237 | 6,064,194 | 36.58% | 1,567,905 | 2,218,282 |

B. Number of potential jurors who have **not decided** they are more likely to find Defendants **guilty**.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who have not decided they are more likely to find Defendants guilty | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 28.11% | 135,844 | 193,831 |
| FL | 7,505,432 | 10,908,580 | 62.82% | 4,714,912 | 6,852,770 |
| NC | 2,786,323 | 4,056,244 | 51.83% | 1,444,151 | 2,102,351 |
| VA | 4,286,237 | 6,064,194 | 51.80% | 2,220,271 | 3,141,252 |

C. Number of potential jurors **"never or almost never" exposed** to information re: Events of Jan. 6.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who are "never or almost never" exposed to information re: Events of Jan. 6. | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 4.83% | 23,341 | 33,305 |
| FL | 7,505,432 | 10,908,580 | 13.77% | 1,033,498 | 1,502,111 |
| NC | 2,786,323 | 4,056,244 | 12.78% | 356,092 | 518,388 |
| VA | 4,286,237 | 6,064,194 | 13.40% | 574,356 | 812,602 |

D. Number of potential jurors who **did not feel "personally affected,"** experience **restriction on their free movement**, feel increased **concern for their safety** or the safety of people important to them, or identify with a group that they believe was **targeted**.

| Test Area | Registered voters in federal district | Census population in federal district | Percent that didn't experience a personal impact or identify with a group they believe was targeted | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 18.15% | 87,725 | 125,172 |
| FL | 7,505,432 | 10,908,580 | 60.77% | 4,561,179 | 6,629,330 |
| NC | 2,786,323 | 4,056,244 | 52.74% | 1,469,499 | 2,139,252 |
| VA | 4,286,237 | 6,064,194 | 52.01% | 2,229,419 | 3,154,195 |

E. Number of potential jurors who do **not** identify with a group or class of people they believe was **targeted** by the Events of January 6th.

| Test Area | Registered voters in federal district | Census population in federal district | Percent who do not identify with a group or class of people they believe was targeted by Events of Jan. 6 | Estimated # of potential jurors from voter roll population | Estimated # of potential jurors from Census population |
|---|---|---|---|---|---|
| DC | 483,257 | 689,545 | 55.59% | 268,643 | 383,318 |
| FL | 7,505,432 | 10,908,580 | 94.24% | 7,073,119 | 10,280,246 |
| NC | 2,786,323 | 4,056,244 | 83.33% | 2,321,843 | 3,380,068 |
| VA | 4,286,237 | 6,064,194 | 82.25% | 3,525,430 | 4,987,800 |

Table 1.



| Figure 1. Prejudicial Prejudgment and Bias Against Defendants - Summary of Results |
|---|

**Q3. Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?**



(Q3.) More likely than not to vote any January 6th defendant GUILTY:

- DC: 71.89%
- FL: 37.18%
- NC: 48.17%
- VA: 48.20%

Figure 1a.

| Q3. How would likely vote if juror: | Guilty | Not Guilty | Too Early to Decide |
|---|---|---|---|
| DC | 71.89% | 7.40% | 20.71% |
| FL | 37.18% | 43.52% | 19.31% |
| NC | 48.17% | 34.15% | 17.68% |
| VA | 48.20% | 26.35% | 25.45% |

**Q5. In your opinion, which of the following terms best characterizes The Events of January 6th?**



(Q5.) Characterize the Events of January 6th as either an INSURRECTION, ATTACK or RIOT:

- DC: 84.71%
- FL: 40.43%
- NC: 51.61%
- VA: 56.92%

Figure 1b.

| Q5. Characterization of the Events of January 6: | Insurrection | Attack | Riot | Protest That Got Out of Control | Rally | Don't Know |
|---|---|---|---|---|---|---|
| DC | 55.66% | 16.21% | 12.84% | 12.23% | 1.83% | 1.22% |
| FL | 27.96% | 6.69% | 5.78% | 44.38% | 12.16% | 3.04% |
| NC | 30.65% | 9.35% | 11.61% | 31.29% | 13.55% | 3.55% |
| VA | 38.68% | 9.43% | 8.81% | 32.39% | 9.12% | 1.57% |

**Q6. Do you believe that the individuals who entered the Capitol on January 6th planned to do it in advance or decided to do it that day?**



(Q6.) Believe ALL who entered the U.S. Capitol on January 6 PLANNED IN ADVANCE to do so:

- DC: 71.17%
- FL: 39.44%
- NC: 49.34%
- VA: 48.40%

Figure 1c.

| Q6. Planned in advance to enter Capitol or decided that day: | Planned in Advance | Some Planned in Advance; Some Decided That Day | Decided That Day | Don't Know |
|---|---|---|---|---|
| DC | 71.17% | 15.64% | 9.20% | 3.99% |
| FL | 39.44% | 13.66% | 37.58% | 9.32% |
| NC | 49.34% | 14.24% | 30.13% | 6.29% |
| VA | 48.40% | 12.18% | 34.94% | 4.49% |

**Q9. Do you believe The Events of January 6th were racially motivated?**



(Q9.) Believe ALL the Events of January 6th were RACIALLY MOTIVATED:

- DC: 40.32%
- FL: 11.22%
- NC: 20.21%
- VA: 19.80%

Figure 1d.

| Q9. Were the Events of January 6 racially motivated: | Yes - Racially Motivated | Some Were; Some Were Not | No - Not Racially Motivated | Don't Know |
|---|---|---|---|---|
| DC | 40.32% | 21.59% | 35.56% | 2.54% |
| FL | 11.22% | 7.69% | 78.21% | 2.88% |
| NC | 20.21% | 11.64% | 62.67% | 5.48% |
| VA | 19.80% | 13.76% | 63.76% | 2.68% |

Figure 1.



## Figure 2. Degree of Prejudicial Prejudgment - Summary of Results

Four questions (Q3., Q5., Q6., Q9.) were used to assess prejudicial bias arising from prejudgment on questions of the case. Options to reserve judgment were offered but were often rejected, especially by the DC Community. Over 91% of the DC Community has formed at least one opinion prejudicial to Defendants out of the four prejudgment questions. Almost 83% of the DC Community has made at least two prejudicial prejudgments out of four tested. Over 66% indicated making at least three, and almost 30% of the DC Community admits having already formed opinions prejudicial to Defendants on every prejudgment question.

Of respondents who answered all four prejudgment questions, how many made at least one prejudicial prejudgment?



| Did Respondent Make at Least One Prejudicial Prejudgment? | Yes - Made at Least One Prejudicial Prejudgment | No - Did Not Make at Least One Prejudicial Prejudgment |
| --- | --- | --- |
| DC | 91,11% | 8,89% |
| FL | 49,35% | 50,65% |
| NC | 61,30% | 38,70% |
| VA | 63,42% | 36,58% |

Of respondents who answered all four prejudgment questions, how many made at least two prejudicial prejudgments?



| Did Respondent Make at Least Two Prejudicial Prejudgments? | Yes - Made at Least Two Prejudicial Prejudgments | No - Did Not Make at Least Two Prejudicial Prejudgments |
| --- | --- | --- |
| DC | 82,54% | 17,46% |
| FL | 40,32% | 59,68% |
| NC | 51,37% | 48,63% |
| VA | 55,03% | 44,97% |

Of respondents who answered all four prejudgment questions, how many made at least three prejudicial prejudgments?



| Did Respondent Make at Least Three Prejudicial Prejudgments? | Yes - Made at Least Three Prejudicial Prejudgments | No - Did Not Make at Least Three Prejudicial Prejudgments |
| --- | --- | --- |
| DC | 66,03% | 33,97% |
| FL | 31,29% | 68,71% |
| NC | 40,07% | 59,93% |
| VA | 43,29% | 56,71% |

Of respondents who answered all four prejudgment questions, how many made all four prejudicial prejudgments?



| Did Respondent Make All Four Prejudicial Prejudgments? | Yes - Made All Four Prejudicial Prejudgments | No - Did Not Make All Four Prejudicial Prejudgments |
| --- | --- | --- |
| DC | 29,84% | 70,16% |
| FL | 9,68% | 90,32% |
| NC | 15,41% | 84,59% |
| VA | 15,10% | 84,90% |

Figure 2.



## Figure 3. Personal Impact and Perceived Victimization Within Jury Pool - Summary of Results

**Q2. Were you personally affected by The Events of January 6th?**



| Q2. Personally Affected by Events of January 6 | Yes - Personally Affected | No - Not Personally Affected | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 45.87% | 49.29% | 4.84% |
| FL | 23.56% | 71.51% | 4.93% |
| NC | 30.32% | 64.14% | 5.54% |
| VA | 23.86% | 70.17% | 5.97% |

**Q7. Have you experienced any inconvenience or restriction on your movement due to curfews, road closures or restricted access imposed in response to The Events of January 6th?**



| Q7. Restriction on Free Movement | Yes - Experienced Restriction | No - Did Not Experience Restriction | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 47.34% | 48.59% | 4.08% |
| FL | 5.40% | 90.48% | 4.13% |
| NC | 8.14% | 86.44% | 5.42% |
| VA | 15.08% | 80.66% | 4.26% |

**Q8. Have you experienced increased concern about your own safety or the safety of people important to you due to The Events of January 6th?**



| Q8. Increased Concern for Safety | Yes - Experienced Increased Concern | No - Did Not Experience Increased Concern | Not Sure/ Don't Remember |
|---|---|---|---|
| DC | 66.14% | 29.75% | 4.11% |
| FL | 27.07% | 68.47% | 4.46% |
| NC | 32.88% | 60.62% | 6.51% |
| VA | 36.67% | 59.33% | 4.00% |

**Does the Community identify as members of a group it believes was targeted by The Events of January 6th? (Q9., Race/ethnicity from Q15., Q16.)**



| Q15., Q16., Q9. Identify as Member of Group They Believe Was Targeted | Yes - Identify as Member of Group They Believe Was Targeted | Member of Group but Unsure if Targeted | No - Not a Member of Group OR Do Not Believe Group Was Targeted OR Both |
|---|---|---|---|
| DC | 44.41% | 1.36% | 54.24% |
| FL | 5.76% | 1.02% | 93.22% |
| NC | 16.67% | 1.81% | 81.52% |
| VA | 17.75% | 1.09% | 81.16% |

Figure 3.



| DC Community (% of the whole) | Claims Can Be Fair | Admits Not Fair | Unsure if Fair |
|---|---|---|---|
| Expects to Vote Guilty | 51% | 15% | 8% |
| Expects to Vote Not Guilty | 4% | 1% | 1% |
| Too Early to Decide | 16% | 2% | 4% |
| **FL Middle - Ocala (% of the whole)** | Claims Can Be Fair | Admits Not Fair | Unsure if Fair |
| Expects to Vote Guilty | 20% | 12% | 6% |
| Expects to Vote Not Guilty | 30% | 8% | 5% |
| Too Early to Decide | 10% | 4% | 3% |
| **NC Eastern (% of the whole)** | Claims Can Be Fair | Admits Not Fair | Unsure if Fair |
| Expects to Vote Guilty | 31% | 11% | 7% |
| Expects to Vote Not Guilty | 21% | 8% | 4% |
| Too Early to Decide | 13% | 1% | 4% |
| **VA Eastern (% of the whole)** | Claims Can Be Fair | Admits Not Fair | Unsure |
| Expects to Vote Guilty | 33% | 11% | 6% |
| Expects to Vote Not Guilty | 17% | 4% | 3% |
| Too Early to Decide | 19% | 4% | 3% |

Figure 4.



Figure 5. Confidence in Fairness by Number of Prejudicial Prejudgments - Summary of Results

Q11. Respondents were asked if they could be fair and impartial jurors. The DC Community had more confidence in their ability to be fair when they had made all four prejudicial prejudgments than when they had not made any. The other Test Areas report lower confidence in their ability to be fair as their negative bias increases. The colored lines below demonstrate the trendlines of claims of fairness as bias increases. Bias was tested on Q3., Q5., Q6., Q9.



Figure 5.



| Figure 6. Exposure to Media and Other Information About the Case(s) |
|---|

**Q4. How often would you estimate that you see, read, or hear about the events of January 6th from either the Media, Local Leaders or the people around you?**



| Q4. How Often See, Hear or Read About The Events of January 6th? | At Least 10 Times per Week | Several Times per Week | 1 -2 Times per Week | Never or Almost Never |
|---|---|---|---|---|
| DC | 32.02% | 41.09% | 22.05% | 4.83% |
| FL | 25.75% | 39.82% | 20.66% | 13.77% |
| NC | 25.24% | 39.30% | 22.68% | 12.78% |
| VA | 28.04% | 34.58% | 23.99% | 13.40% |

Figure 6.



STUDY DESIGN AND METHODOLOGY

A.  Overview

If a jury is to reflect the voice of the community, then the voice of the community can speak for its jury. Finding the real truth in the community voice, however, depends on first asking the appropriate questions in the appropriate way to the appropriate people. The findings contained in this report are the results of a good-faith effort to do all of these things to the greatest extent possible.  To complete this comparative community attitude study ("Study"), In Lux Research ("ILR") deployed an identical community attitude survey ("CAS") in four separate federal venue units, the United States District Court for the District of Columbia, the United States District Court for the Middle District of Florida – Ocala Division, the United States District Court for the Eastern District of North Carolina, and the United States District Court for the Eastern District of Virginia (collectively the "Test Areas"). To eliminate any difference in the delivery of survey questions and any resulting bias, an identical, pre-recorded survey script was used to facilitate the interviews in all cases. Individuals randomly selected from the eligible jury pool in each Test Area were contacted telephonically. The survey questionnaire and responses were exchanged through an interactive voice response ("IVR") method, which controls the presentation of the survey questions, captures responses entered via touchtone, and prompts respondents to answer questions. This standardized, structured method was selected for a number of reasons, namely that respondents were afforded a private environment for participation and that responses were not subject to any influence or interpretation by interviewers.

No training of interviewers was required, as interviewers were not used beyond the recording of the audio file used for the pre-recorded interview. In fact, no interpretation of actual responses was required for this Study. Any inferences and calculations made from results were made equally and uniformly across all Test Areas. The Study is intended to be fully replicable, and the raw data has been preserved. Interviews were conducted on exactly the same days in each Test Area between February 14 and March 16, 2022. The average

completed interview took respondents just over seven minutes to finalize, which is under the ten-minute limit recommended by the American Society of Trial Consultants' Professional Standards for Venue Surveys ("ASTC Standards"), which advise that longer studies can decrease both the response rate and the reliability of data. This Study avoided these risks by utilizing a design that facilitated a favorable survey length.

B.  Eligibility and Sampling

So that sampling of fair cross-sections representative of realistic juries would naturally occur in the Study, every reasonable effort was taken to replicate official processes used to create master jury wheels and summon jurors[1] when creating the master lists and randomly selecting for inclusion in the Study. The Study's master lists were created, primarily, with a complete and then-current list of voters in each Test Area and, secondarily, with a supplemental list of consumers in each Test Area. Any duplicate records coming in with the second list were removed prior to the merging of the lists into the master list. Respondent households were randomly selected from the master lists of likely eligible jurors within each Test Area's boundaries. In line with the ASTC Standards, all eligible households[2] in each Test Area had an equal and known nonzero chance of being chosen and an equal and nonzero chance of an having an eligible respondent interviewed. Each phone number randomly selected was called back up to seven times, or until contact was made, on various days of the week and at different times of the day.

C.  Demographics and Representativeness

Questions to obtain demographic characteristics of survey respondents were asked after the more probative questions. The Study gathered information on gender, age, education, race, ethnicity and political party, which can be compared to available objective data to confirm representativeness. Distributions of responses to these questions are documented at Appendix A (pages 3-4) and indicate that a fair cross-section of each Test Area was achieved.

D.  The Questionnaire

---

[1] https://www.dcd.uscourts.gov/sites/dcd/files/JurySelectionPlan.pdf
[2] Only households with an available phone number were contacted.

In an effort to measure only existing public opinion related to these cases, special care was taken not to influence survey respondents' opinions in any particular direction and not to present systematically biased information. The intent of the Study was to detect honest opinions, so every effort was made to create an environment conducive to this end. Single response questions, where respondents make one choice from among several clear options per question, were administered by a recorded female, accent-neutral voice. Each CAS utilized the same audio file, in the same order, to conduct every interview. The survey introduction included neutral explanations that described the auspices under which the survey was being conducted, specifically that the survey was being conducted in their area to document how residents "really feel about several issues" and that the "results would be compared to other polls and reports covering the same topics."[3] The wording and tone of the introduction was such that it would be impossible to infer any desirable/undesirable response or any motivation for conducting the CAS, other than to collect honest opinions on several issues and compare the results to the results of other surveys on the same issues. In utilizing such neutral language, the introduction avoided the effects of indirect screening and non-response bias.

By agreeing to continue, respondents indicated they would provide information on how they "really feel about several issues." While it is impossible to know if any respondent intentionally gave dishonest answers, there is no obvious incentive to do so in this context. Any differences between responses offered in this environment and those elicited in the jury selection process should be considered in recognition of the various motivations for being less forthcoming in the jury selection process and the unlikelihood of any such motivations to advocate against one's beliefs on an opinion survey.

E.  Screening

There are limitations in screening survey respondents to the same degree one would be screened for jury service eligibility. For example, asking questions sufficient to reveal all disqualifying or exempting factors or about the exercise of an acceptable excuse would result in such long and numerous questions that respondents could become frustrated and confused. Differences in tolerance for this could create an undesirable non-response bias more detrimental to quality than any resulting overinclusion might cause. Asking too many questions

---

[3] Appendix A - Questionnaire at p. 1

about eligibility after employing proper sampling procedures would squander an opportunity to ask probative questions of more value at the expense of confirming something already established.

Respondents were asked one screening question at the end of the interview confirming that they are either "registered to vote or have a driver license." This question was used to validate the appropriateness of the Study's source lists, which included, primarily, a complete and then-current list of voters in each Test Area and, secondarily, a supplemental list of consumers in each Test Area, with duplicate phone numbers removed. Voter rolls restrict eligibility based on several of the same statuses that may disqualify potential jurors (e.g., lack of citizenship, criminal status, inclusion on another jurisdiction's list), and the ability to understand English was imputed by the respondent's offering of valid responses to the CAS. Because inclusion on the voter rolls was ascertained contemporaneously with deployment of the Study, the threat of stale voter files producing unacceptable numbers of ineligible individuals was lower than found in jury summoning where lists possibly created years prior are used for summoning jurors. Further, many people are registered to vote but do not know that they are registered, resulting in the Study having superior knowledge of voter status in some cases. The nearly absolute proportion of respondents who did not deny being registered to vote or having a driver license (97.45% for the Study)[4], considered with the high percentage of the Study's master list made up of current and valid registered voters, with their most recent phone number appended, shows that the master lists used for each Test Area sufficiently screened for inclusion in a "qualified study."[5]

After each eligible respondent agreed to participate, the interview began with an instruction that respondents could push zero at any time to repeat a question. Additionally, the survey automatically repeated a question two times if no response was given, before marking it as having no response and continuing to the next question. Repeating questions and moving past questions to which respondents offer no timely answer allows the greatest opportunity for respondents to clearly understand every question before answering and ensures that all

---

[4] Appendix B – Frequency Distribution Tables at p.4

[5] "'Qualified' means only that the survey be well-conceived, impartially conducted, and accurately recorded," see ABA Standards for Criminal Justice: Fair Trial and Free Press Standard 8-3.3. Change of venue or continuance (1992). "A survey should be acceptable even when it is conducted (as it usually is) at the behest and expense of an interested party," Corona v. Superior Court, 24 Cal. App. 3d 872 (1972).

answers were provided with a clear understanding of the question. When a question went unanswered, that response was not included in the total responses figure among valid answers but was recorded as "no answer" and listed separately below the valid response area on the frequency distribution tables.

F.  Questions to Measure Awareness of the Events of January 6th and of Defendants

The first question of the survey questionnaire asks respondents if they are "… aware of the demonstrations that took place at the U.S. Capitol Building on January 6, 2021[.]" The purpose of this question was, as suggested by the ASTC Standards, to identify the proportion of the eligible population that is aware of events central to the cases against Defendants. The U.S. Department of Justice hosts a webpage with a list of defendants, including Defendants, it describes as "… charged in federal court in the District of Columbia related to crimes committed at the U.S. Capitol in Washington, D.C, on Wednesday, Jan. 6, 2021." The webpage is titled "Capitol Breach Cases."[6] These events are also commonly referred to as "January 6th," "J6," the "Capitol Insurrection", an "attack on the Capitol," the "Capitol Riots," the "Capitol Siege," the "Capitol Breach," "protests", "demonstrations," "a rally," and various other names. The word "demonstrations" was selected to communicate this question to respondents because ILR considers it to be the most neutral word that could point respondents to the Events in question with the necessary specificity. This specificity is important because only respondents who claimed to know about the "demonstrations that took place at the U.S. Capitol Building on January 6, 2021" were counted in the results of the Study, as its objective was to investigate their attitudes about those events and Defendants, who are charged with crimes related to those events. Had that opening question been at all slanted, various forms of bias would have been inflicted on the Study, compromising its evidentiary value.

G.  Questions to Measure Respondents' Prejudgment of a Case

The Study asks respondents how they are likely to vote if called as a juror for a January 6th defendant.[7] This is a step beyond simply asking for predictions of how respondents predict a case end up; this scenario places them in a position to reveal any prejudgment. Answers to

---

[6] https://www.justice.gov/usao-dc/capitol-breach-cases
[7] Appendix A – Questionnaire at p. 1

this question (Q3.) are the predictions – from the respondents themselves - of how they are likely to find Defendants if chosen as a juror. This is a direct question to detect a shifted burden arising from a presumption of guilt. In addition to "guilty" and "not guilty," respondents were offered the option of choosing that it is "too early to decide," usually a gentle reminder of the socially acceptable response, but that option was declined most of the time. Offering such a socially acceptable response risks inflating the rate of the ideal answer, but ILR chose to give that option, rather than forcing respondents to make a prejudgment. Even so, only about 20% of respondents across the Test Areas think it is too early to decide how they would vote to find a January 6th defendant, including Defendants, even without specifics on the Defendant, the charges, the circumstances, testimony, evidence or a defense. Most respondents did not require a trial or evidence at all to make this decision, let alone a fair trial. In fact, 72% of the DC Test Area presumes it would find Defendants guilty. 48% of both the VA Eastern and NC Eastern Test Areas presume they would find Defendants guilty, and 37% of the FL Middle – Ocala Division presumes it would find Defendants guilty.[8]

"January 6th" cases are extraordinary in that there are hundreds of defendants and a less discernable victim than in most other instances such a test of awareness might be undertaken. Consideration was given at the outset of the Study to including specific names of Defendants, but, given the sheer number of defendants in all related cases and the relatively small population of the District of Columbia, ILR felt that it might be unreasonable to presume that every defendant could conduct a similar study without significantly depleting both the survey respondent pool and the available jury pool and risking actual contact with eventual jurors. ILR elected to launch a pilot deployment of the survey with a questionnaire that offers answer choices that give options to generalize opinions to all Defendants, to acknowledge distinctions between Defendants, and to reserve judgment. The survey is well-suited to ascertain whether respondents' opinions would be materially different if given names of specific individuals or groups. After reviewing preliminary results from the pilot test period, it was clear that repeated offers to differentiate between defendants were largely rejected, as described in full detail below. Essentially, it became apparent that respondents, generally, did not care about the specifics. They issued and reserved judgment based on information they

---

[8] Figure 1a.; Appendix B – Frequency Distribution Tables at p. 1

had or on the acknowledgment that they did not have the necessary information about any Defendant at the time of the survey.  In a conscious effort to prevent potential jurors from learning information about the Events and Defendants from the Study, which would be in conflict with the ASTC Standards, ILR decided that using specific Defendants' names in the Study would unnecessarily increase the risk of confusion during the survey and could create or reinforce bias, with no expected improvement to the reliability of the results. Therefore, ILR found that the existing script and recordings for the survey were ideal for the circumstances, and the pilot deployment transitioned to a full deployment of the surveys, as suggested by the ASTC Standards.

The Study aimed to fully test whether each Defendant's name needs to be used in a CAS to detect actual bias or support a finding of presumed bias against that Defendant. Several questions in the Study offered answers that invited respondents to acknowledge that January 6th defendants should be individually considered on questions of guilt, motivation, premeditation and participation. Respondents repeatedly declined to accept this proposition and, instead, made the same prejudgments or held the same opinion about ALL defendants.[9] There are differences among and between the Test Areas on the how these generalized opinions break. The results of this Study reveal those differences. Because respondents overwhelmingly show no interest in considering any one January 6th defendant as different from the group of all defendants, it was not necessary to interpose names into the survey questions at the time this Study was conducted. Doing so could have created or reinforced prejudicial associations between Defendants and with the Events of January 6th. Requiring such specificity could lead to multiple, redundant surveys being conducted in the District of Columbia Community and could actually inject bias into the Community if not performed in a neutral, non-biasing way.

---

[9] Q3. Figure 1a.; Appendix B – Frequency Distribution Tables at p.1
Q6. Figure 1c.; Appendix B – Frequency Distribution Tables at p.2
Q9. Figure 1d.; Appendix B – Frequency Distribution Tables at p.2

*Lindsay Olson*

8383 Wilshire Blvd. Suite 935
Beverly Hills, CA 90211
contact@inluxresearch.com



# Comparative Community Attitude Study
### re: The Events of January 6th and Defendants Charged in Relation

### Survey Questionnaire – Script for Recorded Interview

Currently, we are conducting a poll in your area to document how residents REALLY feel about several issues - and then comparing our results to other polls and reports covering the same topics.

We would like to include your opinions in our baseline study. Are you willing to spend a few minutes sharing your opinions with me today?
1| If yes, press 1 (go to Instruction)
2| If no, press 2 (TERMINATE)
9| To be added to my Do Not Call list, press 9 (TERMINATE)

Instruction: Great. Thank you for offering to share your opinion. You may press 0 after any question to have it repeated.

Q1. Are you aware of the demonstrations that took place at the U.S. Capitol Building on January 6, 2021?
1|Yes
2|No
3|If you are Not Sure

Q2. Were you personally affected by the events of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

Q3. Are you more likely to find a defendant charged with crimes for activities on January 6th guilty or not guilty? Or is it too early to decide?
1|Guilty
2|Not guilty
3|It's too early to decide.

Q4. How often would you estimate that you see, read or hear about the events of January 6th from either the Media, Local Leaders or the people around you?
1|At least 10 times a week
2|Several times a week
3|Once or twice a week
4|Never or Almost Never

Q5. In your opinion, which of the following terms best characterizes
The Events of January 6th?
1|An insurrection
2|An attack
3|A riot
4|A protest that got out of control
5|A rally
6|If you don't know

Q6. Do you believe that the individuals who entered the Capitol on
January 6th planned to do it in advance or decided to do it that day?
1|If you think participants planned to enter the Capitol in advance
2|If you think they decided to do it that day
3|If you think some planned in advance to do it, and some decided that
day.
4|If you do not have enough information to form an opinion at this
time.


We want to know if you were personally affected by The Events of January
6th. Please tell me if you feel that you experienced any of the following
as a result of The Events of January 6th.
[READ THE SUMMARY OF THE TOPIC AND THEN THE QUESTION TO BE SURE EVERYBODY HAS A
CHANCE TO PROCESS THE QUESTION BEFORE IT IS TIME TO ANSWER.]

Q7. Inconvenience or restriction on your movement –
Have you experienced any restriction on your movement due to curfews,
road closures or restricted access imposed in response to the Events
of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

Q8. Increased concern about your own safety or the safety of people
important to you –
Have you experienced increased concern about your own safety or the
safety of people important to you due to The Events of January 6th?
1|Yes
2|No
3|If you are unsure or don't remember

Q9. Do you believe The Events of January 6th were racially motivated?
1|Yes
2|No
3|Some were, some weren't.
4|If you don't know

Q10. If you were a juror, would you worry that finding a January 6th
defendant Not Guilty would be an unpopular decision that might impact
your career or friendships?
1|Yes
2|No
3|Maybe

Q11. Would it be possible for you to be a fair and unbiased juror for a January 6th Defendant?
1|Yes
2|No
3|Maybe

Q12. Do you believe your neighbors would be fair and unbiased jurors for a January 6th Defendant?
1|Yes
2|No
3|Maybe

To be sure all members of the community are fairly represented in this study, we will close with a few demographic questions.

Q13. What is your gender?
1|Male
2|Female

Q14. In which category does your age fall?
1|18-34
2|35-49
3|50-64
4|65 and up

Q15. Are you Hispanic?
1|Yes
2|No

Q16. What is your race?
1|White
2|Black/African American
3|Asian
4|Two or more races

Q17. What is your highest level of education?
1|Have not earned a high school diploma
2|High school graduate or equivalent
3|Some college, no degree
4|Associate degree or technical certificate
5|Bachelor's degree
6|Graduate or professional degree

Q18. With which Political Party do you most closely identify?
1|Republican
2|Democrat
3|Independent
4|Another party
5|Unsure

Q19. Are you registered to vote OR do you have a driver's license?
1|Yes
2|No
3|Not sure

Thank you for sharing your opinions with me today. We can be reached at [PHONE].



| All Area Total | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1521 | Agreed to survey | 100.00% | 100.00% | 379 | 100.00% | 389 | 100.00% | 369 | 100.00% | 384 | 100.00% |
| | 1450 | Qualified after screening | 95.55% | 95.32% | 364 | 96.04% | 374 | 96.14% | 347 | 94.04% | 365 | 95.05% |

| # of Responses by Test Area | | | Q1. | AWARE EVENTS January6 | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 378 | 24.88% | 1417 | Yes | 93.60% | 93.27% | 352 | 93.12% | 365 | 94.07% | 338 | 91.60% | 362 | 94.27% |
| FL | 388 | 25.54% | 71 | No | 4.46% | 4.69% | 15 | 3.97% | 15 | 3.87% | 22 | 5.96% | 19 | 4.95% |
| NC | 369 | 24.29% | 31 | Not sure | 2.25% | 2.05% | 11 | 2.91% | 8 | 2.06% | 9 | 2.44% | 3 | 0.78% |
| VA | 384 | 25.28% | 1519 | Total answered | 100.00% | 100.00% | 378 | 100.00% | 388 | 100.00% | 369 | 100.00% | 384 | 100.00% |
| ALL | 1519 | 100.00% | | No Answer | | | 1 | 0.26% | 1 | 0.26% | 0 | 0.00% | 0 | 0.00% |
| | | | | Total Asked | | | 379 | | 389 | | 369 | | 384 | |
| | | | | Valid Rate | | | Valid % | 99.74% | Valid % | 99.74% | Valid % | 100.00% | Valid % | 100.00% |

| DC | 351 | 24.88% | Q2. | PERSONALLY AFFECTED | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 365 | 25.87% | 435 | Yes | 27.09% | 30.90% | 161 | 45.87% | 86 | 23.56% | 104 | 30.32% | 84 | 23.86% |
| NC | 343 | 24.31% | 901 | No | 67.16% | 63.78% | 173 | 49.29% | 261 | 71.51% | 220 | 64.14% | 247 | 70.17% |
| VA | 352 | 24.95% | 75 | Not sure/don't remember | 5.24% | 5.32% | 17 | 4.84% | 18 | 4.93% | 19 | 5.54% | 21 | 5.97% |
| ALL | 1411 | 100.00% | 1411 | Total | 100.00% | 100.00% | 351 | 100.00% | 365 | 100.00% | 343 | 100.00% | 352 | 100.00% |
| | | | | No Answer | | | 13 | 3.57% | 9 | 2.41% | 4 | 1.15% | 13 | 3.56% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 96.43% | Valid % | 97.59% | Valid % | 98.85% | Valid % | 96.44% |

| DC | 338 | 25.09% | Q3. | YOU VOTE GUILTY NOTGUILTY | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 347 | 25.76% | 691 | Guilty | 48.19% | 51.36% | 243 | 71.89% | 129 | 37.18% | 158 | 48.17% | 161 | 48.20% |
| NC | 328 | 24.35% | 376 | Not guilty | 30.25% | 27.85% | 25 | 7.40% | 151 | 43.52% | 112 | 34.15% | 88 | 26.35% |
| VA | 334 | 24.80% | 280 | Too early to decide | 20.01% | 20.79% | 70 | 20.71% | 67 | 19.31% | 58 | 17.68% | 85 | 25.45% |
| ALL | 1347 | 100.00% | 1347 | Total | 100.00% | 100.00% | 338 | 100.00% | 347 | 100.00% | 328 | 100.00% | 334 | 100.00% |
| | | | | No Answer | | | 26 | 7.14% | 27 | 7.22% | 19 | 5.48% | 31 | 8.49% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 92.86% | Valid % | 92.78% | Valid % | 94.52% | Valid % | 91.51% |

| | | | Q4. | HOW OFTEN EXPOSED | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 331 | 25.48% | 361 | 10+/week | 26.89% | 27.76% | 106 | 32.02% | 86 | 25.75% | 79 | 25.24% | 90 | 28.04% |
| FL | 334 | 25.71% | 503 | Several/week | 39.56% | 38.70% | 136 | 41.09% | 133 | 39.82% | 123 | 39.30% | 111 | 34.58% |
| NC | 313 | 24.10% | 290 | 1-2/week | 22.37% | 22.35% | 73 | 22.05% | 69 | 20.66% | 71 | 22.68% | 77 | 23.99% |
| VA | 321 | 24.71% | 145 | Never/almost never | 13.09% | 11.20% | 16 | 4.83% | 46 | 13.77% | 40 | 12.78% | 43 | 13.40% |
| ALL | 1299 | 100.00% | 1299 | Total | 100.00% | 100.00% | 331 | 100.00% | 334 | 100.00% | 313 | 100.00% | 321 | 100.00% |
| | | | | No Answer | | | 33 | 9.07% | 40 | 10.70% | 34 | 9.80% | 44 | 12.05% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 90.93% | Valid % | 89.30% | Valid % | 90.20% | Valid % | 87.95% |

| | | | Q5. | CHARACTERIZE EVENTS January6 | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 492 | Insurrection (1) | 34.66% | 38.24% | 182 | 55.66% | 92 | 27.96% | 95 | 30.65% | 123 | 38.68% |
| | | | 134 | Attack (2) | 9.39% | 10.42% | 53 | 16.21% | 22 | 6.69% | 29 | 9.35% | 30 | 9.43% |
| DC | 327 | 25.47% | 125 | Riot (3) | 10.21% | 9.76% | 42 | 12.84% | 19 | 5.78% | 36 | 11.61% | 28 | 8.81% |
| FL | 329 | 25.62% | 386 | Protest that got out of control (4) | 31.84% | 30.07% | 40 | 12.23% | 146 | 44.38% | 97 | 31.29% | 103 | 32.39% |
| NC | 310 | 24.14% | 117 | Rally (5) | 10.64% | 9.17% | 6 | 1.83% | 40 | 12.16% | 42 | 13.55% | 29 | 9.12% |
| VA | 318 | 24.77% | 30 | Not sure/don't know (6) | 2.31% | 2.35% | 4 | 1.22% | 10 | 3.04% | 11 | 3.55% | 5 | 1.57% |
| ALL | 1284 | 100.00% | 1284 | Total | 100.00% | 100.00% | 327 | 100.00% | 329 | 100.00% | 310 | 100.00% | 318 | 100.00% |
| | | | | No Answer | | | | | 37 | 10.16% | 45 | 12.03% | 37 | 10.66% | 47 | 12.88% |
| | | | | Total Asked | | | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 89.84% | Valid % | 87.97% | Valid % | 89.34% | Valid % | 87.12% |
| | | | From Q5. | Criminality of Events | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
| | | | 751 | Criminal in nature (1)+(2)+(3) | 54.27% | 58.49% | 277 | 84.71% | 133 | 40.43% | 160 | 51.61% | 181 | 56.92% |
| | | | 416 | Possibly criminal/unsure (4)+(6) | 34.40% | 32.40% | 44 | 13.46% | 156 | 47.42% | 108 | 34.84% | 108 | 33.96% |
| | | | 117 | Not criminal in nature (5) | 10.64% | 9.11% | 6 | 1.83% | 40 | 12.16% | 42 | 13.55% | 29 | 9.12% |
| | | | 1284 | Total | 100.00% | 100.00% | 327 | 100.00% | 329 | 100.00% | 310 | 100.00% | 318 | 100.00% |

| | | | Q6. | PLANNED OR THAT DAY | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 326 | 25.83% | 659 | Planned in advance | 48.87% | 52.22% | 232 | 71.17% | 127 | 39.44% | 149 | 49.34% | 151 | 48.40% |
| FL | 322 | 25.52% | 351 | Decided that day | 32.53% | 27.81% | 30 | 9.20% | 121 | 37.58% | 91 | 30.13% | 109 | 34.94% |
| NC | 302 | 23.93% | 176 | Some planned, some didn't | 13.95% | 13.95% | 51 | 15.64% | 44 | 13.66% | 43 | 14.24% | 38 | 12.18% |
| VA | 312 | 24.72% | 76 | Not sure/not enough info | 5.39% | 6.02% | 13 | 3.99% | 30 | 9.32% | 19 | 6.29% | 14 | 4.49% |
| ALL | 1262 | 100.00% | 1262 | Total | 100.00% | 100.00% | 326 | 100.00% | 322 | 100.00% | 302 | 100.00% | 312 | 100.00% |
| | | | | No Answer | | | 38 | 10.44% | 52 | 13.90% | 45 | 12.97% | 53 | 14.52% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 89.56% | Valid % | 86.10% | Valid % | 87.03% | Valid % | 85.48% |

| DC | 319 | 25.85% | Q7. | RESTRICTED MOVEMENT | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 315 | 25.53% | 238 | Yes | 11.61% | 19.29% | 151 | 47.34% | 17 | 5.40% | 24 | 8.14% | 46 | 15.08% |
| NC | 295 | 23.91% | 941 | No | 83.55% | 76.26% | 155 | 48.59% | 285 | 90.48% | 255 | 86.44% | 246 | 80.66% |
| VA | 305 | 24.72% | 55 | Not sure/don't remember | 4.19% | 4.46% | 13 | 4.08% | 13 | 4.13% | 16 | 5.42% | 13 | 4.26% |
| ALL | 1234 | 100.00% | 1234 | Total | 100.00% | 100.00% | 319 | 100.00% | 315 | 100.00% | 295 | 100.00% | 305 | 100.00% |
| | | | | No Answer | | | 45 | 12.36% | 59 | 15.78% | 52 | 14.99% | 60 | 16.44% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 87.64% | Valid % | 84.22% | Valid % | 85.01% | Valid % | 83.56% |

| DC | 316 | 25.86% | Q8. | CONCERN SAFETY | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 314 | 25.70% | 500 | Yes | 34.77% | 40.92% | 209 | 66.14% | 85 | 27.07% | 96 | 32.88% | 110 | 36.67% |
| NC | 292 | 23.90% | 664 | No | 59.97% | 54.34% | 94 | 29.75% | 215 | 68.47% | 177 | 60.62% | 178 | 59.33% |
| VA | 300 | 24.55% | 58 | Not sure/don't remember | 4.29% | 4.75% | 13 | 4.11% | 14 | 4.46% | 19 | 6.51% | 12 | 4.00% |
| ALL | 1222 | 100.00% | 1222 | Total | 100.00% | 100.00% | 316 | 100.00% | 314 | 100.00% | 292 | 100.00% | 300 | 100.00% |
| | | | | No Answer | | | 48 | 13.19% | 60 | 16.04% | 55 | 15.85% | 65 | 17.81% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 86.81% | Valid % | 83.96% | Valid % | 84.15% | Valid % | 82.19% |

| DC | 315 | 25.88% | Q9. | RACIALLY MOTIVATED | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FL | 312 | 25.64% | 280 | Yes | 20.00% | 23.01% | 127 | 40.32% | 35 | 11.22% | 59 | 20.21% | 59 | 19.80% |
| NC | 292 | 23.99% | 729 | No | 63.21% | 59.90% | 112 | 35.56% | 244 | 78.21% | 183 | 62.67% | 190 | 63.76% |
| VA | 298 | 24.49% | 167 | Some were, some weren't | 12.70% | 13.72% | 68 | 21.59% | 24 | 7.69% | 34 | 11.64% | 41 | 13.76% |
| ALL | 1217 | 100.00% | 41 | Don't know | 2.78% | 3.37% | 8 | 2.54% | 9 | 2.88% | 16 | 5.48% | 8 | 2.68% |
| | | | 1217 | Total | 100.00% | 100.00% | 315 | 100.00% | 312 | 100.00% | 292 | 100.00% | 298 | 100.00% |
| | | | | No Answer | | | 49 | 13.46% | 62 | 16.58% | 55 | 15.85% | 67 | 18.36% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 86.54% | Valid % | 83.42% | Valid % | 84.15% | Valid % | 81.64% |

**Q10. NOTGUILTY NEG EFFECTS**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 311 | 25.85% | | | | | | | | | | | | |
| FL | 311 | 25.85% | 226 | Yes | 18.92% | 18.79% | 60 | 19.29% | 55 | 17.68% | 57 | 19.66% | 54 | 18.56% |
| NC | 290 | 24.11% | 786 | No | 65.23% | 65.34% | 202 | 64.95% | 199 | 63.99% | 190 | 65.52% | 195 | 67.01% |
| VA | 291 | 24.19% | 191 | Maybe | 15.29% | 15.88% | 49 | 15.76% | 57 | 18.33% | 43 | 14.83% | 42 | 14.43% |
| ALL | 1203 | 100.00% | 1203 | Total | 100.00% | 100.00% | 311 | 100.00% | 311 | 100.00% | 290 | 100.00% | 291 | 100.00% |
| | | | | No Answer | | | 53 | 14.56% | 63 | 16.84% | 57 | 16.43% | 74 | 20.27% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 85.44% | Valid % | 83.16% | Valid % | 83.57% | Valid % | 79.73% |

**Q11. POSSIBLE YOU BE FAIR**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 308 | 25.75% | | | | | | | | | | | | |
| FL | 310 | 25.92% | 796 | Could | 67.45% | 66.56% | 216 | 70.13% | 190 | 61.29% | 187 | 65.38% | 203 | 69.52% |
| NC | 286 | 23.91% | 243 | Could Not | 19.73% | 20.32% | 54 | 17.53% | 75 | 24.19% | 58 | 20.28% | 56 | 19.18% |
| VA | 292 | 24.41% | 157 | Maybe | 13.34% | 13.13% | 38 | 12.34% | 45 | 14.52% | 41 | 14.34% | 33 | 11.30% |
| ALL | 1196 | 100.00% | 1196 | Total | 100.00% | 100.00% | 308 | 100.00% | 310 | 100.00% | 286 | 100.00% | 292 | 100.00% |
| | | | | No Answer | | | 56 | 15.38% | 64 | 17.11% | 61 | 17.58% | 73 | 20.00% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 84.62% | Valid % | 82.89% | Valid % | 82.42% | Valid % | 80.00% |

**Q12. POSSIBLE NEIGHBORS FAIR**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 308 | 25.80% | | | | | | | | | | | | |
| FL | 309 | 25.88% | 525 | Yes | 43.00% | 43.97% | 164 | 53.25% | 113 | 36.57% | 129 | 45.10% | 119 | 40.89% |
| NC | 286 | 23.95% | 295 | No | 24.08% | 24.71% | 62 | 20.13% | 94 | 30.42% | 66 | 23.08% | 73 | 25.09% |
| VA | 291 | 24.37% | 374 | Maybe | 32.41% | 31.32% | 82 | 26.62% | 102 | 33.01% | 91 | 31.82% | 99 | 34.02% |
| ALL | 1194 | 100.00% | 1194 | Total | 100.00% | 100.00% | 308 | 100.00% | 309 | 100.00% | 286 | 100.00% | 291 | 100.00% |
| | | | | No Answer | | | 56 | 15.38% | 65 | 17.38% | 61 | 17.58% | 74 | 20.27% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 84.62% | Valid % | 82.62% | Valid % | 82.42% | Valid % | 79.73% |

**Q13. GENDER**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 302 | 25.90% | | | | | | | | | | | | |
| FL | 300 | 25.73% | 543 | Male | 46.43% | 46.57% | 122 | 40.40% | 152 | 50.67% | 119 | 42.20% | 150 | 53.19% |
| NC | 282 | 24.19% | 623 | Female | 53.57% | 53.43% | 180 | 59.60% | 148 | 49.33% | 163 | 57.80% | 132 | 46.81% |
| VA | 282 | 24.19% | 1166 | Total | 100.00% | 100.00% | 302 | 100.00% | 300 | 100.00% | 282 | 100.00% | 282 | 100.00% |
| ALL | 1166 | 100.00% | | No Answer | | | 62 | 17.03% | 74 | 19.79% | 65 | 18.73% | 83 | 22.74% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 82.97% | Valid % | 80.21% | Valid % | 81.27% | Valid % | 77.26% |

**Q14. AGE**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 299 | 25.78% | 53 | 18-34 | 4.68% | 4.57% | 12 | 4.01% | 16 | 5.35% | 7 | 2.49% | 18 | 6.41% |
| FL | 299 | 25.78% | 114 | 35-49 | 9.96% | 9.83% | 34 | 11.37% | 21 | 7.02% | 24 | 8.54% | 35 | 12.46% |
| NC | 281 | 24.22% | 309 | 50-64 | 24.13% | 26.64% | 73 | 24.41% | 71 | 23.75% | 67 | 23.84% | 98 | 34.88% |
| VA | 281 | 24.22% | 684 | 65+ | 62.04% | 58.97% | 180 | 60.20% | 191 | 63.88% | 183 | 65.12% | 130 | 46.26% |
| ALL | 1160 | 100.00% | 1160 | Total | 100.00% | 100.00% | 299 | 100.00% | 299 | 100.00% | 281 | 100.00% | 281 | 100.00% |
| | | | | No Answer | | | 65 | 17.86% | 75 | 20.05% | 66 | 19.02% | 84 | 23.01% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 82.14% | Valid % | 79.95% | Valid % | 80.98% | Valid % | 76.99% |

**Q15. HISPANIC**

| | | | | | Median | Mean | DC | | FL MIDDLE (OCALA) | | NC EASTERN | | VA EASTERN | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 298 | 25.80% | | | | | | | | | | | | |
| FL | 300 | 25.97% | 63 | Hispanic | 5.35% | 5.45% | 13 | 4.36% | 19 | 6.33% | 11 | 3.94% | 20 | 7.19% |
| NC | 279 | 24.16% | 1092 | Not Hispanic | 94.65% | 94.55% | 285 | 95.64% | 281 | 93.67% | 268 | 96.06% | 258 | 92.81% |
| VA | 278 | 24.07% | 1155 | Total | 100.00% | 100.00% | 298 | 100.00% | 300 | 100.00% | 279 | 100.00% | 278 | 100.00% |
| ALL | 1155 | 100.00% | | No Answer | | | 66 | 18.13% | 74 | 19.79% | 68 | 19.60% | 87 | 23.84% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.87% | Valid % | 80.21% | Valid % | 80.40% | Valid % | 76.16% |

**Q16. ETHNICITY/RACE**

| Region | N | % | Count | Category | Median | Mean | DC | DC % | FL MIDDLE (OCALA) | % | NC EASTERN | % | VA EASTERN | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 296 | 25.83% | 737 | White | 69.13% | 64.31% | 117 | 39.53% | 237 | 80.07% | 196 | 70.50% | 187 | 67.75% |
| FL | 296 | 25.83% | 278 | Black/African American | 18.94% | 24.26% | 146 | 49.32% | 27 | 9.12% | 59 | 21.22% | 46 | 16.67% |
| NC | 278 | 24.26% | 21 | Asian | 1.18% | 1.83% | 4 | 1.35% | 3 | 1.01% | 1 | 0.36% | 13 | 4.71% |
| VA | 276 | 24.08% | 110 | Two or more races | 9.80% | 9.60% | 29 | 9.80% | 29 | 9.80% | 22 | 7.91% | 30 | 10.87% |
| ALL | 1146 | 100.00% | 1146 | Total | 100.00% | 100.00% | 296 | 100.00% | 296 | 100.00% | 278 | 100.00% | 276 | 100.00% |
| | | | | No Answer | | | 68 | 18.68% | 78 | 20.86% | 69 | 19.88% | 89 | 24.38% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.32% | Valid % | 79.14% | Valid % | 80.12% | Valid % | 75.62% |

**Q17. EDUCATION**

| Region | N | % | Count | Category | Median | Mean | DC | DC % | FL MIDDLE (OCALA) | % | NC EASTERN | % | VA EASTERN | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 40 | No high school diploma | 3.37% | 3.48% | 11 | 3.70% | 9 | 3.03% | 13 | 4.69% | 7 | 2.53% |
| | | | 200 | High school graduate or equivalent | 18.86% | 17.42% | 49 | 16.50% | 63 | 21.21% | 59 | 21.30% | 29 | 10.47% |
| DC | 297 | 25.87% | 232 | Some college, no degree | 19.49% | 20.21% | 49 | 16.50% | 75 | 25.25% | 59 | 21.30% | 49 | 17.69% |
| FL | 297 | 25.87% | 119 | Associate's or technical certificate | 10.47% | 10.37% | 19 | 6.40% | 42 | 14.14% | 39 | 14.08% | 19 | 6.86% |
| NC | 277 | 24.13% | 243 | Bachelor's degree | 18.69% | 21.17% | 51 | 17.17% | 51 | 17.17% | 56 | 20.22% | 85 | 30.69% |
| VA | 277 | 24.13% | 314 | Graduate or professional degree | 25.48% | 27.35% | 118 | 39.73% | 57 | 19.19% | 51 | 18.41% | 88 | 31.77% |
| ALL | 1148 | 100.00% | 1148 | Total | 100.00% | 100.00% | 297 | 100.00% | 297 | 100.00% | 277 | 100.00% | 277 | 100.00% |
| | | | | No Answer | | | 67 | 18.41% | 77 | 20.59% | 70 | 20.17% | 88 | 24.11% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.59% | Valid % | 79.41% | Valid % | 79.83% | Valid % | 75.89% |

**Q18. PARTY**

| Region | N | % | Count | Category | Median | Mean | DC | DC % | FL MIDDLE (OCALA) | % | NC EASTERN | % | VA EASTERN | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 336 | Republican | 32.91% | 29.32% | 17 | 5.80% | 136 | 45.95% | 88 | 31.88% | 93 | 33.94% |
| DC | 293 | 25.72% | 467 | Democrat | 35.09% | 41.00% | 197 | 67.24% | 77 | 26.01% | 98 | 35.51% | 95 | 34.67% |
| FL | 296 | 25.99% | 254 | Independent | 23.56% | 22.30% | 51 | 17.41% | 66 | 22.30% | 69 | 25.00% | 68 | 24.82% |
| NC | 276 | 24.23% | 24 | Another party | 2.14% | 2.11% | 4 | 1.37% | 2 | 0.68% | 10 | 3.62% | 8 | 2.92% |
| VA | 274 | 24.06% | 60 | Unsure | 4.53% | 5.27% | 24 | 8.19% | 15 | 5.07% | 11 | 3.99% | 10 | 3.65% |
| ALL | 1139 | 100.00% | 1139 | Total | 100.00% | 100.00% | 293 | 100.00% | 296 | 100.00% | 276 | 100.00% | 274 | 100.00% |
| | | | | No Answer | | | 71 | 19.51% | 78 | 20.86% | 71 | 20.46% | 91 | 24.93% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 80.49% | Valid % | 79.14% | Valid % | 79.54% | Valid % | 75.07% |

**Q19. REG VOTE OR DL**

| Region | N | % | Count | Category | Median | Mean | DC | DC % | FL MIDDLE (OCALA) | % | NC EASTERN | % | VA EASTERN | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DC | 296 | 26.06% | 1107 | Yes | 97.62% | 97.45% | 285 | 96.28% | 289 | 98.30% | 267 | 98.16% | 266 | 97.08% |
| FL | 294 | 25.88% | 19 | No | 1.28% | 1.67% | 10 | 3.38% | 2 | 0.68% | 3 | 1.10% | 4 | 1.46% |
| NC | 272 | 23.94% | 10 | Unsure | 0.88% | 0.88% | 1 | 0.34% | 3 | 1.02% | 2 | 0.74% | 4 | 1.46% |
| VA | 274 | 24.12% | 1136 | Total | 100.00% | 100.00% | 296 | 100.00% | 294 | 100.00% | 272 | 100.00% | 274 | 100.00% |
| ALL | 1136 | 100.00% | | No Answer | | | 68 | 18.68% | 80 | 21.39% | 75 | 21.61% | 91 | 24.93% |
| | | | | Total Asked | | | 364 | | 374 | | 347 | | 365 | |
| | | | | Valid Rate | | | Valid % | 81.32% | Valid % | 78.61% | Valid % | 78.39% | Valid % | 75.07% |