**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-cr-138 (RBW)** |
| **RICHARD COOK,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Richard Cook to 24 months of incarceration (the top of the applicable guidelines range as calculated by the Probation Office and the government), 36 months of supervised release, $2,000 in restitution, and a mandatory assessment of $195.

## I.    INTRODUCTION

The defendant, Richard Cook, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Cook traveled, alone, from his home in Florida to Washington, D.C. to attend the "Stop the Steal" rally on January 6, 2021. After listening to then-President Trump's speech, he marched with the crowd to the Capitol's West Plaza. After rioters violently surged forward and forced police officers on the West Plaza to retreat, Cook made his way to the Inaugural Stage. Once there, Cook entered the "Tunnel"—the epicenter of violence on January 6—several times, and each time joined the mob in forcefully and violently pushing against a line of police officers guarding the entrance. During this first entry, Cook and the mob collectively bashed into police officers in coordinated "heave ho" pushes, ultimately crushing one officer who was caught between a metal door frame and a stolen riot shield held by a rioter. After being pushed out of the tunnel, he rushed back in, coming even closer to the police line than he did before. He again repeatedly and violently pushed into the police line. After being pushed out of the tunnel a second time, Cook remained near the mouth of the tunnel for more than an hour-and-a-half as he continued to watch and encourage other rioters' vicious attacks against police officers. At trial, Cook testified on his own behalf, spouting lies contradicted by the videos admitted into evidence.

The government recommends that the Court sentence Cook to 24 months of incarceration for his convictions of violating 18 U.S.C. § 231(a)(3); 18 U.S.C. §§ 1752(a)(1), (2), and (4); and 40 U.S.C. §§ 5104(e)(2)(E) and (F). A 24-month sentence reflects the gravity of Cook's conduct on January 6, as well as his false testimony at trial and continued lack of remorse.

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts supporting the criminal complaint filed in this case, ECF 9-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Richard Cook's Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

On January 6, 2021, Cook attended the "Stop the Steal" rally in support of the former president. After attending the rally, Cook marched with the crowd to the U.S. Capitol, approaching from the west. Upon arriving at the restricted Capitol grounds, Cook entered the "West Plaza" by at least 2:15 p.m. Gov. Tr. Exs. 113, 516 at 1:46:40. While on the West Plaza, Cook witnessed police officers use crowd control tactics, such as the use of tear gas and OC spray. *Id.* He testified that a flashbang grenade exploded close to him. Trial Tr. 5/8/24 218-229.

At approximately 2:29 p.m., after having been flanked and attacked for over an hour-and-a-half, the police line on the West Front of the Capitol completely broke and rioters surged forward. Gov. Tr. Ex. 113. Officers retreated towards the Capitol building and funneled into a narrow staircase built into the inaugural stage as they tried to prevent the mob's entry into the building. *Id.* At the top of the stairs on the Inaugural Stage, officers retreated to the closest entrance into the Capitol, now referred to as the "Tunnel." *Id.* Rioters followed the officers and surged forward up the stairs to the Inaugural Stage and to other areas of the Capitol.

By at least 3:05 p.m., Cook had made his way to the Inaugural Stage, and joined the crowd

in chanting and yelling. Gov. Tr. Ex. 508. As Metropolitan Police Department ("MPD") Sergeant

William Bogner and Officer Omar Forrester each testified, by the time Cook had made it to the

Inaugural Stage, rioters had already started attacking police officers in the Tunnel in attempt to

enter the Capitol building.



*Image 1: Screenshot of video footage from Gov Ex. 508 showing Cook (yellow circle) screaming
and cheering as rioters attacked police officers inside the tunnel*

### Cook's Activities In and Near the Tunnel

Evidence presented at trial showed that, while on the Inaugural Stage, Cook witnessed the

chaos and violence inside the Tunnel. For example, he watched as other rioters exited the Tunnel

suffering from the effects of chemical irritants, passed stolen police shields to the crowd outside

the Tunnel, and violently pushed against the police line. *See* Gov. Tr. Ex. 507.



*Image 2: Screenshot of Capitol Police Surveillance Footage from Gov. Tr. Ex. 708 showing Cook (yellow circle) peering into the Tunnel as rioters violently pushed into the police line*

Rioters just a few feet away from Cook yelled to the crowd, "We're almost through! We need more people!" and "We need fresh people!" and "PUSH!" *See* Gov. Tr. Ex. 705 at 14:39-15:14. One rioter turned to Cook and another rioter and asked, "hey guys, are you going in or not?" *Id.* at 15:25-:32. Then, at 3:12 p.m., Cook rushed into the Tunnel just as other rioters mounted a collective thrust against the police line.



*Image 3: Screenshot of CCTV footage from Gov. Tr. Ex. 708 showing Cook (yellow circle) rushing into the Tunnel*

5

Instantly, Cook joined the collective pushing into the police line. At trial, Officer Forrester testified that these collective pushes—sometimes referred to as "heave ho" pushes—were far more difficult for police officers to contain than any individual push by a single rioter. Trial Tr. 5/8/24 at 131–32.

Shortly after Cook joined the rioters' collective pushes against the police line, another rioter pinned MPD officer Daniel Hodges between a metal doorframe and a stolen police shield. The collective force of heave-hoing rioters brutally squeezed officer Hodges between the frame and the shield, causing him to cry out in pain. *See* Gov. Tr. Ex. 707.



*Image 4: Screenshot from Gov. Tr. Ex. 707 showing Cook (yellow arrow, right) collectively pushing into the police line as Officer Hodges officer (left) was crushed by the force of the rioters' heave hoes*

At 3:13 p.m., Cook was pushed out of the Tunnel. Just two minutes later, Cook ran back into the Tunnel for a second time. With no one directly behind him, Cook bolted into the tunnel, quickly filling the empty space.



*Images 5 & 6: Screenshots from Gov. Tr. Ex. 705 at 19:11-19:20 showing Cook bolting into the tunnel for the second time and instantly joining the mob pushing into police officers*

During his second stint in the Tunnel, as the mob forcefully coordinated efforts to bash into police officers, Cook leaned his body forward, gritted his teeth, and forcefully pushed with the crowd into the police line. Gov. Tr. Ex. 503.3.



*Image 7: Still shot (Gov. Tr. Ex. 503.3) depicting Cook (yellow circle) forcefully pushing into the police line*



*Images 8 & 9: Screenshots from Gov. Tr. Exs. 502 (left) and 503 (right) depicting Cook (yellow circle) forcefully pushing into the police line*

As Cook and his fellow rioters collectively thrusted their bodies forward, they yelled, "PUSH!" and "HEAVE! HO!" *See* Gov. Tr. Ex. 707.



*Images 10 & 11: Screenshots from Gov. Tr. Exs. 502 (left) and 503.2 (right) depicting Cook (yellow circle) forcefully pushing into the police line*

Eventually, at about 3:18 p.m., the police began to regain control of the Tunnel, and Cook was pushed out of the Tunnel a second time. *See* Gov. Tr. Ex. 701 at 21:38.

Moments later, several rioters dragged MPD Officer Michael Fanone out of the tunnel and brutally assaulted him—feet away from Cook. Gov. Tr. Exs. 514, 525.



*Images 12 & 13: Screenshots of Gov. Tr. Exs. 514 at 4:51 (left) and 525 (right) showing rioters assaulting Officer Fanone feet away from Cook*

After Officer Fanone was dragged back to the police line, Cook and the crowd chanted, "POLICE STAND DOWN!" Cook then made his way back towards the mouth of the tunnel. For the next hour-and-a-half, he cheered as his fellow rioters viciously attacked police officers using a variety of weapons, including a wooden club, a baseball bat, bear spray, and a pole. *See, e.g.*, Gov. Tr. Exs. 505, 506.

### Cook's FBI Interview

Prior to his arrest, Cook voluntarily spoke with the FBI about his actions on January 6, 2021. *See* Gov. Tr. Ex. 801. During the interview, Cook showed no remorse for his actions on January 6 and, in fact, placed the blame for the day's events squarely on the police. For example,

in response to seeing injured and bloody rioters on the West Plaza, Cook stated that the police had engaged in "oppressive behavior," Gov. Tr. Ex. 801 at 15:20-15:25, and called them "tyrannical," *id.* at 13:27-:33. He admitted that, when entering the Tunnel, his goal was "to figuratively break through. Break through the tyranny." *Id.* at 24:09-24:23. Cook also admitted that, when he finally left the Capitol on January 6, he approached a police officer and asked, "How could you do this?" *Id.* at 38:12-:20.

Cook's subsequent trial testimony flatly contradicted several of his interview statements. For example, Cook testified at trial that he never saw any bike racks or other barriers when he approached the Capitol. Trial Tr. 5/8/24 at 207; Trial Tr. 5/9/24 (Morning Session) at 70. But he told the FBI agents that he saw another rioter "pick[ing] up a gate," which he described as a "WWF-style protecting gate[]." Gov. Tr. Ex. 801 at 17:25-18:35. Cook testified that he never pushed with the crowd against the police line in the tunnel. Trial Tr. 5/9/24 (Morning Session) at 118. But in his FBI interview, he agreed when the interviewer characterized his actions as pushing against the police presence in the Tunnel, and he added: "to get into the building." Gov. Tr. Ex. 801 at 28:55-29:02. The interviewer also asked Cook if he was "shoving" in the Tunnel, and Cook nodded and stated that "the intent was to move forward." *Id.* at 25:10-25:17.

### Cook's False Testimony at Trial

Cook repeatedly testified falsely at trial. His testimony was proven to be false by video evidence and, in some instances, by the jury's findings of guilt.

Cook testified falsely about various video exhibits, either by falsely authenticating exhibits or by demonstrably lying about the video's contents. For example, Cook testified that Gov. Tr. Ex. 705 depicted him saying, "I am getting out of here." Trial Tr. 5/8/24 at 240-41; Trial Tr. 5/9/24

(Morning Session) at 78. As he acknowledged on cross-examination, the statement "I am getting out of here" has seven syllables. Trial Tr. 5/9/24 (Morning Session) at 78. But the video, as the government pointed out on cross, showed him opening his mouth just once or twice. *Id.* at 79; Gov. Tr. Ex. 705 at 13:32-:36. The video clearly depicted Cook saying, "fuck that," and Cook eventually admitted that, at the very least, he initially said the word "fuck." Trial Tr. 5/9/24 (Morning Session) at 79.

Cook also testified extensively about specific instances of what he referred to as "police brutality," including an incident involving a flashbang that was thrown into the crowd by the police. Trial Tr. 5/8/24 218-229. Cook introduced into evidence—over strenuous government objections—a video depicting this flashbang. Def. Tr. Ex. 403. To authenticate the third-party video, Cook testified that he had stood near *this specific* flashbang at *this specific moment*, which he estimated to be approximately 2:30 p.m. Trial Tr. 5/8/24 at 218, 220, 228-29. During his testimony, he described feeling "the vibrational shake of the earth" when that particular flashbang exploded. *Id.* at 228-29. He stated that he witnessed "a lot of suffering from the crowd" when this particular flashbang exploded and that, after the explosion, he was nearby "trying to help people." *Id.* On cross-examination, Cook again emphasized that he experienced that *particular* flashbang shown in Def. Ex. 403. Trial Tr. 5/9/24 (Morning Session) at 48-50.

The government then presented evidence showing that Cook was not present when that flashbang was detonated. *Id.* at 51; Trial Tr. 5/9/24 (Afternoon Session) at 3–6. Specifically, the government compared Def. Ex. 403 to timestamped CCTV footage of the west plaza, Gov. Tr. Ex. 316. Using multiple points of reference, the government, on cross-examination, pinpointed the time and location of the flashbang depicted in Def. Ex. 403: approximately 1:24:55 p.m. Trial Tr.

5/9/24 (Afternoon Session) at 6. Not only was this more than an hour before Cook claimed when authenticating the video, it was approximately an hour before Cook arrived at the Capitol grounds. Trial Tr. 5/8/24 at 209, 228.

After being confronted with this evidence, Cook changed his story on redirect, merely saying that he experienced different flashbangs while on the West Plaza after approximately 2:30 p.m. Trial Tr. 5/9/24 (Afternoon Session) at 9–11; Def. Obj. to Draft PSR, ¶ 1. But this does not change the fact that, under oath, he falsely authenticated evidence—which was then placed before the jury—by claiming to have seen a specific flashbang at a specific time, and the evidence showed that to be a lie.

Cook also testified falsely about key facts regarding his crimes. For example, he testified that *every time he entered the Tunnel* he was acting entirely involuntarily. Cook repeatedly testified that he was forcibly pulled into the Tunnel (the first time) by a rioter glaring at him with "devil eyes." Trial Tr. 5/9/24 (Morning Session) at 24, 84. In Cook's telling, this stranger so overwhelmed him by holding his neck in a "death grip" that his entry into the Tunnel was wholly involuntary.[2] Trial Tr. 5/8/24 at 244-45. But the video footage showed that the man with "devil eyes" had touched Cook's shoulder for no more than three seconds as he waved numerous rioters into the tunnel. Trial Tr. 5/9/24 (Morning Session) at 85-86; Gov. Tr. Ex. 705 at 15:29–15:33.

Cook also testified that another rioter in a blue hat forcibly pushed him into the Tunnel, causing his second entrance. Trial Tr. 5/9/24 (Morning Session) at 31-33; 104-109. On cross-

---

[2] In fact, Cook continues to advance this argument even in his objections to the draft PSR. Despite the jury's finding of guilt, he continues to assert that he was "assaulted by another rioter who grabbed him by the nape of neck, squeezed his neck, and pushed him in the tunnel the first time." Def. Obj. to Draft PSR, ¶ 3.

examination, Cook was shown video footage, from multiple angles, that depicted Cook running into the Tunnel as the rioter in the blue hat directed traffic into the Tunnel. Gov. Tr. Ex. 705 at 19:07–19:15. That video showed that (a) the rioter in the blue hat touched Cook's back for just one second and (b) by that time, Cook had already stepped into the Tunnel. Trial Tr. 5/9/24 (Morning Session) at 104-109. Even after being confronted with this evidence, Cook repeatedly denied that his actions were voluntary.

And, whenever asked about his time *inside* the Tunnel, Cook denied ever pushing forward of his own volition. Rather, he claimed that he was merely a "trapped" victim, "being shoved from behind" or "pushed" by other rioters. Trial Tr. 5/9/24 (Morning Session) at 25, 35, 118. The video evidence also contracted those false claims. *See, e.g.,* Gov. Tr. Ex. 708 at 08:40–09:10; 709 at 20:00–20:15; 711; 712 at 9:45–10:00.

By returning a guilty verdict on Count One, the jury found beyond a reasonable doubt that, at a minimum, Cook acted knowingly and with the intent to obstruct, impede, or interfere with law enforcement officers in the Tunnel. To reach this verdict, the jury necessarily must have found— beyond a reasonable doubt—that Cook's testimony alleging his actions were involuntary was incredible.

Similarly, even after being confronted on cross-examination with all of the signs he saw that alerted him that the Capitol was restricted, Cook testified that he thought he was allowed to be on Capitol grounds on January 6, 2021. Trial Tr. 5/9/24 (Morning Session) at 73-77. By finding Cook guilty of Counts Three and Four—which require a finding that Cook *knowingly* entered, remained, or engaged in disorderly conduct on restricted grounds—the jury necessarily refused to credit Cook's testimony that he thought he was permitted to be on Capitol grounds.

### III.     THE CHARGES

On April 26, 2023, a federal grand jury returned an indictment charging Cook with six counts, including Civil Disorder (18 U.S.C. § 231(a)(3)); Entering or Remaining in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(1)); Disorderly or Disruptive Conduct in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(2)); Engaging in Physical Violence in a Restricted Building or Grounds (18 U.S.C. § 1752(a)(4)); Impeding Passage Through the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(E)); and Act of Physical Violence in the Capitol Grounds or Buildings (40 U.S.C. § 5104(e)(2)(F)).

On, May 10, 2024, a jury convicted Cook of all counts.

### IV.     STATUTORY PENALTIES

Richard Cook now faces sentencing on the charges listed above. The Presentence Report accurately states the maximum penalties for his offenses of conviction. *See* PSR ¶¶ 109–114.

### V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The government agrees with the final PSR's Sentencing Guidelines calculation for Count One, set forth below.

Count Two: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact[3] | +3 |

---

[3] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2A2.4(b)(1)(A) applies because Cook's offense conduct involved physical contact.

| | | |
|---|---|---|
| U.S.S.G. § 3C1.1 | Obstruction of Justice | +2 |
| | **Total** | **15** |

However, the PSR did not include Guidelines calculations for Counts Three, Four, and Five, so the government includes those calculations below.

Count Three: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2B2.3 | Base Offense Level | 4 |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds[4] | +2 |
| | | |
| *U.S.S.G. § 2B2.3(c)(1)* | *(§2X1.1(a) cross-reference to Count One)* | |
| | | |
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2J1.2(b)(2) | Obstruction of Justice | +2 |
| | **Total** | **15** |

Count Four: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2J1.2(b)(2) | Obstruction of Justice | +2 |

---

Cook repeatedly joined the mob in collectively pushing against police officers in the Tunnel. Although Cook did not personally make direct contact with the officers, "physical contact" need not be direct and encompasses indirect uses of force. *See, e.g.*, *United States v. Taliaferro*, 211 F.3d 412, 415-16 (7th Cir. 2000) (specific offense characteristic properly applied where inmate threw a cup of urine into a prison guard's face); *United States v. Shelton*, 431 F. Supp. 2d 675, 675-77 (E.D. Tex. 2006) (defendant threw a cup containing feces and urine at a prison guard, which struck his head, face, and chest), *aff'd* 230 F. App'x 457 (5th Cir. 2007). Courts have held that the specific offense characteristic applied to a defendant who worked in concert with a codefendant who made indirect contact with the victim. *See United States v. Beltran-Higuera*, 642 F. App'x 780, 782-84 (9th Cir. 2016). And courts in this district, including this Court, have applied this specific offense characteristic to January 6 defendants who engaged in collective pushes inside the Tunnel, even where the defendant did not personally make direct contact with a police officer. *See, e.g., United States v. Baugh*, 22-cr-313 (JEB); *United States v. Preller*, 23-cr-045 (TNM); *United States v. Nolf*, 23-cr-162 (BAH); *United States v. Jessica Reyher*, 23-cr-138 (RBW).

[4] As described in the government's objections to the draft PSR, the government submits that U.S.S.G. § 2J1.2(b)(1)(B) applies because the defendant's offense occurred "at any restricted building or grounds." On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B).

|  |  | **Total** | **15** |
|---|---|---|---|

Count Four: 18 U.S.C. § 1752(a)(4)

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
|---|---|---|
| U.S.S.G. § 2A2.4(b)(1)(A) | Physical Contact | +3 |
| U.S.S.G. § 2J1.2(b)(2) | Obstruction of Justice | +2 |
|  | **Total** | **15** |

The PSR correctly states that Counts One and Five form one group ("Group 1") under U.S.S.G. §§ 3D1.2(a) because they involve the same victim, namely the police officers at the Capitol on January 6. PSR ¶ 52. Likewise, Counts Three and Four form one group ("Group 2") because they involve the same victim, Congress. PSR ¶ 53. The government and the final PSR agree that Group 1 and Group 2 are grouped together pursuant to U.S.S.G. § 3D1.2(c) because the conduct in Group 1 embodies conduct treated as a specific offense characteristic to the guideline applicable to Group 2—specifically, the "physical conduct" characteristic under U.S.S.G. § 2A2.4(b)(1). PSR ¶ 55. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to this combined group is the offense level which produces the highest offense level, making the total offense level 15. PSR ¶ 54, 75.

The U.S. Probation Office calculated Cook's criminal history as category I, which is not disputed. PSR ¶ 78.

Accordingly, based on Cook's total adjusted offense level at 15, Cook's Guidelines imprisonment range is 18 to 24 months' imprisonment.

### *Obstruction Enhancement under § 3C1.1*

As the PSR correctly notes, Cook's false testimony at trial should result in a two-point enhancement under U.S.S.G. § 3C1.1. Application Notes 4(B) and 4(F) to Section 3C1.1 state that

"committing . . . perjury" is one type of conduct to which the two-level obstruction enhancement applies, as is "providing materially false information to a judge." *United States v. Dunnigan*, 507 U.S. 87, 92-95 (1993). Whether Cook committed either type of conduct must be shown by a preponderance of the evidence.[5] *See United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). The Court should make specific findings at sentencing as to each element of perjury: that Cook gave "false testimony concerning a material matter with the willful intent to provide false testimony." *Dunnigan*, 507 U.S. at 94.

Cook's testimony satisfies this standard. As discussed above, Cook repeatedly testified falsely about essential elements of Count One—namely, his knowledge and intent. Cook brazenly testified that *none* of his actions inside or even near the Tunnel were voluntary. Conveniently for Cook, in his telling, there was always someone else nearby forcibly moving him into the Tunnel and toward the police line—even though the video evidence presented at trial shows quite the opposite. Cook's testimony about his mental state was certainly material, and, by convicting him on Count One, the jury found beyond a reasonable doubt that it was not credible. And the voluntariness of his own actions is hardly a small detail that Cook might have misstated "as a result of mistake or faulty memory." *Dunnigan*, 507 U.S. at 94. Rather, Cook lied under oath in an

---

[5] "At one time," the D.C. Circuit required proof of perjury for 3C1.1 purposes by clear-and-convincing evidence. *United States v. Makki*, 47 F. Supp. 2d 25, 29 n.3 (D.D.C. 1999) (citing *United States v. Montague*, 40 F.3d 1251, 1253 (D.C. Cir. 1994)). But the D.C. Circuit subsequently interpreted a 1997 amendment to the sentencing guidelines to mean that "such allegations could now be proven by a preponderance of the evidence." *United States v. Smith*, 374 F.3d 1240, 1245 (D.C. Cir. 2004) (citing *United States v. McCoy*, 242 F.3d 399, 407 n.14 (D.C. Cir. 2001)). While *Montague* has not, to the government's knowledge, been expressly overruled, the government is not aware of it having been cited favorably in a 3C1.1 perjury case that involved the post-1997 guidelines. Of course, Cook committed perjury under either standard of proof.

attempt to evade responsibility for his actions. In so doing, he obstructed justice and should therefore receive U.S.S.G. § 3C1.1's two-point enhancement.

*Application of § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. The PSR correctly concludes that Section 4C1.1 does not apply in this case, PSR ¶ 74, because—by convicting Cook of Count Five—the jury found beyond a reasonable doubt that he engaged in acts of violence when he joined the mob in collectively pushing against police officers in the Tunnel. Moreover, as this Court has noted when declining to applying Section 4C1.1 in another January 6 case involving conduct in the Tunnel, Cook's attempts to push past police lines involved the intent to engage in violence. *United States v. Arthur & Jessica Reyher*, 23-cr-138 (RBW), ECF No. 180 at 15-16 ("You can't . . . take the position 'I did not intend to engage in violence' when the objective of trying to get to where you wanted to go would necessitate the use of violence to accomplish that objective.").

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a significant term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Richard Cook's felonious conduct on

18

January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. As this Court observed when sentencing two of Cook's co-defendants, this is a "very, very serious offense . . . [that] goes to the heart of what America is supposed to be." *United States v. Arthur & Jessica Reyher*, 23-cr-138 (RBW), Tr. 02/27/24 at 57. On the very stage where the President-elect would be inaugurated a few weeks later, Cook joined the mob in violently pushing against police officers in an attempt to force entry into the Capitol. And, despite his testimony at trial, these were voluntary acts: Cook knew what he was doing and, after leaving the Tunnel the first time, he went back for more. The nature and circumstances of Cook's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 24 months of incarceration.

### B. Cook's History and Characteristics

As set forth in the PSR, Cook was raised in a two-parent, upper-middle class home. PSR ¶ 86. He reports having had a "great childhood" and being "fortunate to grow up in a great family." *Id.* He received a bachelor's degree in chemical engineering from an elite private university and continued his studies with a post-baccalaureate studies program at an Ivy League university. PSR ¶ 94. From the time of the offense through trial, Cook has been consistently employed—except for a brief period in late 2021—as either a data analyst or an operations analyst. PSR ¶ 97-99.

Cook is not married and has no children or other dependents. PSR ¶ 87. He reports having never suffered from any mental or emotional health problems or any recurring medical conditions. PSR ¶¶ 91-92. Cook also reports that he does not have any issues with substance abuse. PSR ¶ 93.

In short, Cook has been afforded many advantages in life but nevertheless chose to engage

in serious criminal conduct. His history and characteristics provide no mitigation for his violent criminal behavior on January 6, 2021.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Cook's criminal conduct on January 6 was the epitome of disrespect for the law and helped set "a precedent for acting in violence if you don't get the [political] result you want." *United States v. Arthur & Jessica Rehyer*, 23-cr-138 (RBW), Tr. 02/27/24 at 59.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Cook was involved in violence toward police officers in the Tunnel on more than one occasion. And, rather than accept responsibility for this behavior, Cook has shown no remorse and, in fact, has lied on the stand in an attempt to avoid responsibility.

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

Cook has had numerous opportunities to show remorse for his violent actions on January 6, including his FBI interview, trial testimony, and presentence interview—but he has shown none. Rather, Cook has repeatedly deflected blame for his actions. Whether it was a stranger with "devil eyes," a man with a blue hat, or another rioter conveniently just off screen in the video footage, the only person that Richard Cook did not blame was Richard Cook. And, not only has Cook not shown any remorse for the pain and trauma he helped inflict on the police, he has placed the blame on the police themselves, categorizing their actions on January 6 as "police brutality," "oppressive behavior," and "tyranny."

The Court should therefore view any newfound remorse Cook expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Cook's lack of remorse, and particularly his statements at trial blaming law enforcement for the chaos and violence on January 6, suggest that additional punishment is needed to deter Cook specifically from future criminal activity.

The need for specific deterrence is especially strong here. With the 2024 presidential election approaching and many loud voices in the media and online continuing to sow discord and distrust, the potential for a repeat of January 6 looms ominously. The Court must sentence Cook in a manner sufficient to deter him specifically, and others generally, from going down that road

again.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

22

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768-69 (D.C. Cir. 2018) (cleaned up).

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[8] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court has already sentenced three of Cook's co-defendants. Two of those sentencings are appropriate § 3553(a)(6) comparators here.[9] For example, in *United States v. Arthur Reyher*, 23-cr-138-004, this Court imposed a guidelines sentence on a defendant who engaged in conduct that was substantially similar to Cook's. Like Cook, on January 6, Arthur Reyher used violent means in attempt to gain access to the Capitol building when he entered the Tunnel (more than once) and violently pushed against the police line alongside Cook. Also like Cook, Arthur Reyher encouraged other rioters when he yelled things like, "PUSH!" and "HEAVE HO!" After Reyher pled guilty to one count of violating 18 U.S.C. § 231(a)(3), this Court sentenced Reyher to 8 months of incarceration—the bottom of his guidelines range. Notably, the Court credited Mr. Reyher's remorse and acceptance of responsibility, and found that, in Reyher's case, there was no need for specific deterrence. Tr. 02/27/24 at 58. Those mitigating factors don't exist here.

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[9] The Court issued a below-guidelines sentence for one of Cook's co-defendants: Jessica Reyher, who was sentenced to 90 days' incarceration despite a guidelines range of 8-14 months. However, the Court explicitly based this downward departure on the fact that Mrs. Reyher was the primary caretaker for her four minor children and for her mother. No similar mitigating factor exists for Cook, who has no dependents.

24

Likewise, in *United States v. Jonathan Grace*, 23-cr-138-002 (RBW), the defendant approached the Tunnel and, after watching the violence, rushed inside to engage in the collective pushing. Like Cook, Grace made his way far into the Tunnel and used the full force of his body weight to collectively and repeatedly bash into police officers, ultimately making physical contact with at least one officer. As in *Reyher*, Grace pled guilty (to one count of violating 18 U.S.C. § 111(a)(1)), accepted responsibility for his conduct, and expressed remorse for his actions and participation in the riot. This Court sentenced Grace to 24 months of incarceration, at the bottom end of the guidelines range.

Even beyond Cook's co-defendants, this Court has previously sentenced defendants whose actions on January 6 mirror Cook's in relevant ways. For example, in *United States v. Zerkle*, 22-cr-100 (RBW), the defendant pushed against police officers on the West Plaza, both through individual shoves and collective pushing. Zerkle's violent conduct lasted just under five minutes, similar to the amount of time Cook spent in the Tunnel. And, although Jacob Zerkle, unlike Cook, made direct contact with a number of officers, Cook acted in the much more violent context of the Tunnel. Zerkle pled guilty (to one count of violating 18 U.S.C. § 111(a)(1) and one count of violating 18 U.S.C. § 231(a)(3)), accepted responsibility for his conduct, and expressed remorse for his actions. This Court sentenced Zerkle to 24 months of incarceration, at the bottom end of the guidelines range. [10]

---

[10] Though in certain ways factually distinguishable from the present case, this Court also sentenced Tucker Weston to 24 months of incarceration, at the bottom end of the guidelines range. Like Zerkle, Weston shoved against police officers on the West Plaza and pled guilty to one count of violating 18 U.S.C. § 111(a)(1) and one count of violating 18 U.S.C. § 231(a)(3).

Although Cook's conduct was comparable to that of the defendants discussed above, he is set apart in two distinct respects for purposes of sentencing. First, Cook did not plead guilty. Rather, he vigorously contested the elements of his crimes at trial. And notably, Cook contested guilt on every count by presenting a demonstrably false narrative about his actions and intent on January 6. Cook's failure to accept responsibility, his repeated false testimony, and the blame he placed on police officers for his and other rioters' actions demand a higher sentence than that of Arthur Reyher and a comparable sentence to Jonathan Grace and Jacob Zerkle.

Second, unlike Reyher, Grace, and Zerkle, Cook has not expressed any remorse for his conduct. Thus, there is an acute need for specific deterrence in this case, and a sentence at the top of his guidelines range is appropriate.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The

MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because Cook was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[11]

---

[11] Both statutes permit the sentencing court to decline to impose restitution where doing so will

Because Cook in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold Cook responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Cook to pay $2,000 in restitution for his conviction on Count One. This amount fairly reflects Cook's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

---

"complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a mandatory assessment of $195.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      /s/ Ashley Akers
        ASHLEY AKERS
        MO Bar No. 69601
        Trial Attorney, Detailee
        1100 L Street NW
        Washington, DC 20005
        Ashley.Akers@usdoj.gov
        (202) 353-0521

        /s/ Sean J. Brennan
        SEAN J. BRENNAN
        Assistant United States Attorney
        NY Bar No. 5954128
        601 D Street NW
        Washington, DC 20530
        sean.brennan@usdoj.gov
        (202) 252-7125