## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 23-CR-138(RBW)** |
| **RICHARD COOK,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

*And all Israel heard of the judgment which the king had rendered; and they feared the king; for they saw that the wisdom of God was in him to administer justice.  1 Kings 3:28.*

### I.      INTRODUCTION

Mr. Cook  is not the demon the government makes him out to be. The defense asks this Court to, for a moment, step outside the J6 scripted narrative of the government and look at the facts of this case. Mr. Cook, a person who is peaceful, hardworking and concerned about America's future,  came to DC to lend support to poll workers because of perceived  irregularities in the vote counting process.[1] He wasn't here to assault police officers,  interrupt Congress or stop the vote, nor was he charged with that.[2] He expected J6 to be like a similar protest he'd attended a couple months before in D.C-peaceful and meaningful.  As this Court

---

[1] See Tr. May 8 am, p. 166. *See also,* recorded statement taken by the FBI.
[2] If ever there was a ham sandwich, J6 cases provide the government the ultimate meal in the grand jury which is made up of 96% Biden voters. Mr. Cook was charged with civil disorder-the easiest felony for the government to prove. But it's a rare  Court that holds the government to relevant evidence in these cases. The government is allowed to muck up the record with all kinds of scenarios as if Mr. Cook had been charged with violations of 18 USC 1512, 111, or seditious conspiracy. This Court should not let the government do this.

heard during this trial and  other trials, the protest turned into an unmanageable

mob and riot.  Yet Mr. Cook never, not once, came into contact with any police

officer. He did  not communicate with or harm any officer.  After J6, Mr. Cook

voluntarily sought out the police and turned himself in when he learned that he was

wanted by the police. He told the truth.[3] Isn't that the right thing to do? Mr. Cook

should be sentenced for his conduct and his conduct alone-not the conduct of the

other defendants.[4] Mr. Cook has spoken about his remorse and holds himself

accountable for his actions on January 6, 2021.

OBJECTIONS TO THE PSR

After carefully reviewing the PSR with Mr. Cook the defense filed certain

objections with the probation officer.

Mr. Cook made an objections to paragraphs 18, 19, 22, 23, 24, 25, 26, 27, 29,

37, 57. 70, and 94. *See* PSR.  Mr. Cook also objected to the fact that he was not given

2 levels off under the First Step Act. *See* U.S.S.G. §4C1.1(a)(7), and that he was

given a two point upward adjustment for obstruction of justice under U.S.S.G.

§3C1.1. He did not engage in any physical contact with police and objected to that

3-point adjustment as well.

---

[3] We know Mr. Cook told the FBI the truth because the recording of his "confession" captured the agents speaking at the end after Mr. Cook left the office and one of the officers expressed his sincere belief that Mr. Cook told them the truth and was forthcoming. Undersigned counsel confirmed this by interviewing FBI agent Sickney along with AUSA Akers that surreptitiously recorded the conversation. He told us that Mr. Cook was truthful in the interview.

[4] Only the most relevant facts will be repeated since the Court heard the trial.

Mr. Cook is a perfect candidate for the two point offense level reduction (zero point offender adjustment) recently promulgated by the U.S. Sentencing Commission under 4C1.1.[5] Mr. Cook objects to not being given this two level lower adjustment under the guidelines. His individual conduct did not involve violence nor the threat of violence. The Commission promulgated the zero-point offender provision in recognition of low recidivism rates of first time offenders and the Congressional directive "that alternatives to incarceration are generally appropriate for first offenders not convicted of a violent or otherwise serious

---

[5] The defendant must meet all of the following criteria to qualify for the 2-level reduction:

1. the defendant has not received any criminal history points;

2. the defendant has not received an adjustment for terrorism (covered by § 3A1.4);

3. the defendant did not use violence or credible threats of violence in connection with the offense;

4. the offense did not result in death or serious bodily injury;

5. the offense of conviction is not a sex offense;

6. the defendant did not personally cause substantial financial hardship (to be determined independently of the application of § 2B1.1(b)(c));

7. the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

8. the offense of conviction is not an offense involving individual rights (covered by § 2H1.1);

9. the defendant did not receive an adjustment under § 3A1.1 (hate crime motivation or vulnerable victim) or § 3A1.5 (serious human rights offense); and,

10. the defendant did not receive an adjustment under § 3B1.1 (aggravating role) and was not engaged in a continuing criminal enterprise.

offense." [6] The Commission has identified crimes that are violent or otherwise serious and the conviction here does not fall under the exclusions. In other words, his conduct does not fall within one of the enumerated exclusions to application of this provision.  Mr. Cook meets all of these criteria. *See* U.S.S. G. 5C1.1; 28 USC 994(j). In order for a crime to be violent in nature, courts have determined that to qualify as "using violence," one must "use physical force with the intent to injure[.] *United States v. Pineda-Duarte,* 933 F.3d 519, 523 (6th Cir 2019). And "credible threats of violence" require one to credibly "express an intention to inflict pain, harm, or punishment" through violence. *See United States v. Hernandez Barajas*, 71 F.4[th] 1104, 1107 (8th Cir. 2023). The evidence here does not show Mr. Cook used violence or credible threat of violence nor did he have intent to injury anyone.

Other judges in this courthouse have applied this adjustment with conduct much worse than Mr. Cook's. In *U.S. v. Yang*, No 23-CR-100(JDB), 2024 WL 519962 (D.D.C. Feb. 9, 2024)(granting 4C1.1 adjustment where defendant grabbed an officer's wrist during a scuffle and was part of a crowd that did not depart in the face of advancing police line). Judge Mehta also rejected the government's argument that just because an individual defendant who was part of a crowd that engaged in violence but who did not himself engage in violence is ineligible for the

---

[6]Amendments to Sentencing Guidelines (April 27, 2023) at 78-80 *(citing* 28 U.S.C.Section 994(j)).

reductions. *See United States v. Parks*, 21-CR-411. There, the government

argument that because the defendant was at the "front of a crowd rush" and was

"aware of [violence]," that the adjustment did not apply. Judge Mehta reasoned

that the defendant's conduct "did not result in death or serious bodily injury" and

the defendant "did not use violence or credible threats of violence." [7] Judge Bates[8]

has also rejected this use of violence in not imposing the plus 3 levels under GL

2A2.4(b)(1). *See also, US v Hunter Palm*, No. 1:21-cr-00393 (RDM)(Judge Moss

gave the reduction).

   Mr. Cook has objected to this enhancement. *See* PSR, paragraph 57. The

theory is that Mr. Cook's presence aided and abetted others in making physical

contact with the police. Judge Bates reasoned that "we can't assume that his

actions assisted any one person with contact with the police and the government

here hasn't identified a principal"  and "it was not reasonably forseeable to the

defendant under 1B1.3(a)(1)(B) that his actions would cause contact with police."[9]

*See* transcript, exhibit1. The same applies in this case. Judge Bates rejected this

government "indirect pushing concept theory"  because the defendant was not at

the front of the line by the doors. Likewise, Mr. Cook never saw anyone at the

---

[7] *See* Transcript of Sentencing, Tr. at 38.
[8] *See U.S. v. Hazelton*, 21 CR 30 (JDB).
[9] The defendant in Hazelton had urged others into the tunnel by yelling "move forward." The defendant also believed J6 to be the first shot in a revolution and she blamed the police. *See*,  exhibit 1 Transcript, p. 34. She was given 10 days incarceration.

doors being crushed because of far back he was and had no idea that their intention was to hurt an officer. He testified that he thought they were trying to get into the Capitol. *See* pictures, *infra.*

As far as the obstruction, the government cannot prove this and this court should not give this enhancement. The Probation Officer's application of Guideline 3C1.1 for false testimony is in error but in his defense, he is only getting his information from the government.[10] This enhancement only applies upon a finding by clear and convincing evidence that defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of mistake or faulty memory." *United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir. 1997) (per curiam) (*quoting United States v. Dunnigan*, 507 U.S. 87, 94 (1993)). There has been no evidence that anything Mr. Cook testified about was a material matter with the willful intent to provide false testimony. In fact, Mr. Cook was completely honest in his testimony to his detriment as illustrated by the conversations he had on direct examination with this Court while he was testifying:

> THE COURT: The question is: Did you actually see
> what's being depicted on that photograph?
> THE WITNESS: Can I recall if it's exact to the tee?
> I mean, I can't say that but I can say that that is what I saw
> on November 14th, 2020. I was at that exact location with
> people walking in that exact area.
>
> THE COURT: That's not the question. Do you recall

---

[10] Transcripts of Mr. Cook's testimony have been attached as exhibits 3 & 4 May 8, & 9, 2024.

*that you actually saw what is being shown on that photograph?*
*THE WITNESS: This specifically with this individual*
*with the flags, I can't say definitively, but that area, yes.*
*THE COURT: Then I'll sustain the objection.*

*Tr., 5/8/24 at p. 174.[11]*

And this:

*BY MS. WEST:*
*Q. Do you know who these people are in this photograph?*
*A. I see a couple what looks like to be police officers.*
*Q. Do you know them personally?*
*A. I don't.*
*Q. Do you remember seeing them that day?*
*A. At some point I saw them.*
*Q. Saw who?*
*A. Police officers.*
*THE COURT: Did you see them at this point, running*
*like they are.*
*THE WITNESS: They may have been running around.*
*Specifically running in that fashion, I can't definitively say.*
*THE COURT: Well.*
*MS. AKERS: Then, Your Honor, we reraise the same*
*objection.*
*(The following was held sidebar, outside the hearing of the*
*jury:)*
*THE COURT: Pick up. I mean, I'll admit it for the*
*sole purpose of him saying that this depicts a location where*
*he was at. But he can't say, based upon what he said, that he*
*actually saw this particular image as far as the people and*
*everything else, but he can only say that this is a location*
*where he was at.*

*Id. at p. 185.[12]*

---

[11] Contrast this testimony of the defendant with that of officer Omar Forrester who testified that he'd seen each and every video the government put in front of him, even when he wasn't in the video. The woodshedding of witnesses is apparent here.

[12] Mr. Cook testified extensively about what he saw on November 14, 2020 and on January 6, 2021 and the tenor of his visits on both occasions. He also testified about what advertisements he saw on the internet which informed his decisions of the day. *Id*. at 192-197.

He testified he went to the Capitol because Trump said he would be there too. *Id*. at 190. Critically, the government even admits that what Mr. Cook testified to was his belief, which is unobjectionable:

*Did you take the President at his word?*

*A. I did.*

*Q. Tell the members of the jury where you believed President Trump would go from this spot to the next spot?*

*MS. AKERS: Objection.*

*THE COURT: Repeat that again. Tell us what?*

*MS. WEST: Tell us where you believed President Trump would go from this spot to the next spot.*

*THE COURT: Pick up.*

*(The following was held sidebar, outside the hearing of the jury:)*

*THE COURT: Yes, government.*

*MS. AKERS: If that's her question, I suppose if it's his belief, that's fine.*

*THE COURT: Very well.*

*Id.* at 203. He also testified he was by himself and did not know anyone personally that day. *Id.* at 204.

There were also instances of the government repeatedly objecting to

defendant's exhibits when exact times could not be established, for example:[13]

> THE COURT: No, I'm asking the government, what time
> is the government saying -- you are saying you have information
> that would show this was a different time?
> MS. AKERS: Yeah, I believe this is around 2:20 to
> 2:25. This is a clipped version, it appears, 15 seconds it
> appears the defendant has clipped. I think this is earlier

---

[13] Here, defense counsel is trying to offer exhibit 403, and it's important to remember that the government did not even present any evidence of Mr. Cook on the West lawn in their case and knew nothing about it until the defense brought it up in their case. *Id.* at 223. The government constantly and incorrectly objected during Mr. Cook's direct examination. Here's a prime example: *BY MS. WEST:*
*Q. Mr. Cook?*
*A. Yes.*
*Q. I'd like to draw your attention to Government*
*Exhibit 507.1, which is in evidence.*
*Do you recognize this?*
*A. I do.*
*Q. Have you seen it before?*
*A. I have.*
*Q. What area is it?*
*A. It is in the upper terrace of the Capitol, before the*
*tunnel.*
*Q. I hate --*
*MS. AKERS: This is not in evidence, Your Honor.*
*MS. WEST: May we pick up the phone, Your Honor?*
*(The following was held sidebar, outside the hearing of the*
*jury:)*
*MS. WEST: I believe this exhibit, Your Honor, and*
*she'll correct me if I'm wrong, is the same exhibit that she*
*entered in at the very end of her case.*
*MS. AKERS: No. That was 507. You just pulled up*
*507.1.*
*MS. WEST: Yeah, this is a part of 507.*
*MS. AKERS: It's not in evidence, though.*
*THE COURT: If it's not in evidence, you have to*
*somehow admit it yourself, if it's not in evidence.*
*MS. WEST: It is in evidence because she used it in*
*part of her side-by-side exhibits.*
*THE her side-by-side exhibits.*
*THE COURT: I don't know.*
*COURTROOM DEPUTY: Your Honor, this is the courtroom*
*deputy. I do have that as admitted.*
*THE COURT: 501.1?*
*COURTROOM DEPUTY: Yes.*
*MS. AKERS: We're on 507.1.*
*COURTROOM DEPUTY: That's correct. I have you moving*
*it into evidence.*
*MS. AKERS: I stand corrected. I apologize. Id. at p. 233.*

*than what they're proffering it as. He can testify when it is,*
*that's fine, but she hasn't asked him that question.*
*MS. WEST: I'm going to ask him that question.*
*THE COURT: Go ahead.*
*(Sidebar concluded. The following was held in open court:)*
*BY MS. WEST:*
*Q. If you could, Mr. Cook, give us an approximation of when*
*you believe this video was taken.*
*A. Sometime around 2:30.*
*Q. Okay. Does it fairly and accurately represent what you saw*
*on January 6th?*
*A. It does.*
*Q. At approximately 2:30?*
*A. It does.*
*MS. WEST: At this time, Your Honor, we would offer*
*Defense Exhibit 403.*
*MS. AKERS: Objection.*
*THE COURT: Yes.*
*(The following was held sidebar, outside the hearing of the*
*jury:)*
*MS. AKERS: I'm not meaning to be difficult here but*
*he previously testified when she was showing Exhibit 106 that*
*at 2:30 he was not in this area. So he couldn't have seen what*
*was going on here. He previously testified at 2:30 p.m. he*
*stayed in the area for 30 to 40 minutes. That was on the west*
*front lawn in the grass. And we were looking at Government*
*Exhibit 106 when he testified to that. THE COURT: He did say that it was*
*2:30.*
*MS. WEST: He said approximately. He doesn't know*
*what time he exactly showed up. He said approximately.*
*THE COURT: No -- I mean, have him clear it up that*
*he's approximating what time it was.*
*MS. WEST: Yes, Your Honor.*
*THE COURT: Very well. I'll permit it.*
*Id. at 219-221.*

Pursuant to the United States Sentencing Guidelines (hereinafter "USSG"),

Cook believes that the following Guideline sections apply:

| | | |
|---|---|---|
| USSG 2A2.4(a):   Base offense level. | | 10 |
| USSG 4C1.1: no criminal history | | -2 |
| ADJUSTED OFFENSE LEVEL | | 8 |

Based upon these figures, and a criminal history category of I, Mr. Cook's final guideline range is 0-6 months.

For the reasons set forth herein, Mr. Cook requests that this Honorable Court impose a sentence within this guideline range, and perhaps a period of home confinement,   two years supervised release, 200  hours of community service and $2,000 restitution to account for:

1.   His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that and his sincere remorse in this regard;

2.   His proactive act of turning himself in and voluntarily speaking to the FBI;

3.   His lack of bragging or posting on social media about what happened January 6;

4.   His amazing commitment to his community, his family and his church;

5.   His long history of a strong work ethic which has allowed him to be a productive  and positive member of society;

6.   The fact that he lost his very good job, and his place to live, and

7.      The fact that he's been housed at the DC jail surviving in filth since the verdict-a jail that at least two judges of this Court have found the conditions unconstitutional.

## I.     Background

Mr. Cook is a brother and a son. He graduated from  high school in 2004, and  college in 2008. PSR Paragraph 94.  He has an engineering degree from Carnegie-Mellon. Additionally, Mr. Cook gave the FBI a long recorded statement even though he already had hired an attorney. He wanted to tell the truth. He even told them he would be available for further interviews if needed. When this Court considers  and compares the behavior of other J6 defendants the Court will find that  Mr. Cook was cooperative and has been cooperative since the beginning of this investigation. His pretrial behavior was stellar.

## Previous protests

This Court can only understand why Mr. Cook came from Florida to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021 and thereafter.   There is absolutely no evidence in this case to indicate he had plans to enter the Capitol, to stop the vote, or commit any violence that day.  There is evidence, however, that Mr. Cook became interested in political speech and assembly when the numbers he saw did

not line up in his opinion and experience with statistics. When this Court considers all of the factors before it, the Court must conclude that these are not the actions of someone there to overthrow the government or incite violence.

### Mr. Cook's remorse

Mr. Cook believed that he should show his concern and support for poll workers by attending this rally scheduled for January 6, 2021, at the Ellipse on the Mall. Mr. Cook is very upset that people died that day, that people destroyed certain areas of the Capitol, and that police officers were attacked by the crowd. He is also justifiably upset that the police pummeled a non-violent crowd with minutions.[14] He only learned how horrible the day was days after the fact by watching the news reports, like the rest of us. His concern for all those that died and were injured is sincere, and as he walked to the Capitol, he had no idea that the result would be what it was. His interview to police was open and honest.[15] The FBI agents that wrote this report never stated that he was in any way insincere or

---

[14] The government was not able to show that anyone standing in the area in which Mr. Cook stood engaged in any type of aggressive or violent behavior. Undersigned counsel knows this to be the case from other J6 cases she has defended and the Court most likely knows this as well from presiding over other J6 cases.

[15] In determining sentencing consideration for remorse, the Courts and Guidelines consistently focus on the defendant's behavior <u>after</u> the initiation of the criminal case, rather than prior to a defendant's arrest. For example, under the U.S. Sentencing Guidelines (U.S.S.G.), sentencing level reductions for acceptance of responsibility apply to a defendant's action in pleading guilty after the initiation of the case. U.S.S. G. § 3E1.1. Defendants are not given a more punitive sentence under the U.S.S.G. if they do not indicate remorse prior to filing of the initial charges. Evidence of remorse after initiation of criminal charges is key. This makes sense, as it allows time for the defendant to reflect on the evidence, and his own conduct. This encourages reflection and review, and focuses on the defendant's actions after a defendant has availed himself of his constitutional right to counsel through the initiation of the prosecution of the case.

lying about the facts. He never once refused to answer their questions. He made himself available to them even after he spoke with them.

By the time he made his way up to the upper terrace of the west side of the Capitol, there was no fighting or police interaction to be seen.  No officers were outside in the courtyard at this time and the people were standing around waving flags and gathering on the grounds.    He was not aware before he entered the tunnel that the people at the end of the tunnel closest to the brass doors intended to break through those doors-we of course know this in retrospect, but he did not know this at the time. However, he does not dispute that when he was in the tunnel, rioters were violent and dangerous. The reasonable thing to do would be to turn around and walk away-especially after you've been pushed in by another rioter. He regrets his stupidity.

Mr. Cook has absolutely no history of  political extremism.  He has no criminal convictions. He had absolutely no expectation or knowledge of the consequences of others' actions that day, nor the consequences that their actions would have on his being present.  He was supporting everyday Americans' rights to assemble and speak.

While he did not personally destroy anything, or commit violent acts, the jury found that he illegally played a part in a mob by engaging in civil disorder and disruptive conduct. According to Ed Maguire, a criminologist at Arizona State

University, security forces are trained to ignore yelled insults and small acts of hostility, like pushes and thrown water bottles. And they receive training in absorbing surges in a crowd, moving people as gently as possible, and quickly responding to pockets of violence and isolating agitators.  Benedict Carey, <u>Making Sense of the 'Mob' Mentality</u>, New York Times (Jan. 12, 2021), available at https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html  Mr. Cook  did not commit any of those actions towards police.  On January 6 there was "[n]o clear structure in the crowd and absolute chaos on the police side: no clear sense of credible incident command, of wearing the right gear, carrying the right weapons. All of that seemed to be missing." <u>*Id.*</u>

Importantly, as for persons in the mob "With no apparent structure or strategy, the crowd had no shared goal or common plan." <u>*Id*</u>.  Dr. James Jasper, a sociologist at City University of New York, noted, "Crowds do not act with one irrational mind… There are many groups, doing different things, for different reasons."  He further said, "There are great shots from the hall of statues, where protesters stayed inside the velvet ropes, like tourists, looking around sort of in awe." <u>*Id*</u>.

## III.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been

convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision.[16]

## IV.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).    *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Cook

---

[16] 1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.    The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.
18 U.S.C. § 3553(a)(1-7).

16

Mr. Cook was a follower, not a leader. Mr. Cook was not there to stop a vote or to interfere with anyone; that was never his intention. He simply went to DC to be a part of *the process*.  He understands that his bad, split- second decision not to argue with the man pushing him into the tunnel was wrong and that the second time he entered he should have fought back against the people encouraging and pushing him and others inside.  He understands that his decision to be a follower, and his fear of being seen as resistant to the leaders at the tunnel entrance, led him to participate in the actions of the group in pushing forward in that tunnel.

*Punishment for conduct of others*

Despite this acknowledgement of his own role in making these bad decisions, Mr. Cook should not be punished for decisions and/or violence perpetrated by other people, especially those with a clear intent and plan to attempt to injure or overrun the Capitol Police and MPD officers that day.  He did not engage in violence at any point on January 6th.  His behavior in the tunnel only happened because he was assaulted FIRST-pushed in by a large violent protestor who took Mr. Cook by the neck and squeezed Mr. Cook tightly while forcibly

directing and pushing him into the tunnel. *See* figure 1 from Gov Ex. 301 at 3:12:09pm.



*Figure 1*

      Mr. Cook's second entrance into the tunnel led to him being part of a "heave- ho" of the crowd and he regrets being there at that time, but he wasn't a part of the heave-ho voluntarily.  His decision not to turn away and exit the tunnel entrance area after his first entry was, in part, due to the steep steps and inability to move forward easily or safely, his fear of the men who assaulted him and others and the large number of people urging people to move forward.  Had he been able to leave in a reasonable manner,  he would never have been pushed in again by the riot leaders standing at the entry.  (This is not an excuse, but an explanation – and consistent with his testimony at trial). Once he was ushered in he made the bad

decision not to immediately turn around and leave.  He owns that decision. But this Court must remember the evidence, and the videos show Mr. Cook only about ½ way into the tunnel with no effort by him to move forward.  In fact, the video evidence reflects that at times he is not even capable of standing on his own feet at times during the push and is pulled under by the crowd.  That action tells the Court that he did not intend to harm any officers as his intent was to survive the chaos himself.

Additionally, there is no evidence his intent was to get into the Capitol.   Mr. Cook was in the tunnel for 1 minute and 37 seconds the first time, and 2 minutes and 34 seconds the second time.  Much of that time was spent being crushed in the crowd unable to move or retreat.  In fact, Mr. Cook was approximately 11 people back from the police line during the whole heave-ho episode, unable to clearly see what was happening in front of him and pulled down by the crowd's intense pushing from behind.  *See* figure 2 below which are screengrabs from Gov. Ex. 503.



*Figure 2*

Unlike many others in the crowd, he did not shout for reinforcements, throw objects at the police line or bully or force others into participating in the chaos in the tunnel.   Mr. Cook also did not steal or damage property that day.  He wore the exact same clothes that he'd worn to work that day.  He carried a Chai Tea drink in his hand.  He stood there observing and trying to comprehend.  He was part of a crowd that turned violent.  We now know, that by their mere presence, the crowd overwhelmed the police.   But it should be considered that while others filed into the tunnel that day to fight with police and try to gain entrance further into the building, Mr. Cook did not. There is no evidence that this was the case. No facebook posts, no texts to friends or family. Nothing. Most importantly, he never touched an officer or had any physical contact with any law enforcement officials. He was not even close enough to do so physically.  In fact, there was no evidence at trial that Mr. Cook ever saw a police line  while inside the tunnel area.

Ultimately, a better path would have been to leave the grounds altogether once he saw what was going on out in the crowd and after his involuntary and forced first entry into the tunnel, but he did not. At points in the day, especially earlier on the West Lawn, Mr. Cook did not have a clear understanding of what has occurring.  The crowd had women and children in it and Mr. Cook had a hard time processing the event as clearly unsafe or illegal.  Indeed, all he could see from his vantage point was a crowd being shelled by police and gassed.  This seemed

confusing to Mr. Cook given his prior rally experience. The people close to him were standing around and reacting with astonishment and anger over the perceived abuse of force by the Capitol Police. Indeed, Mr. Cook witnessed this as he was standing directly where a flash bang grenade landed on the West front. Mr. Cook was standing near the left hand side of the media tower at approximately 2:28pm and the government's own exhibit, a time lapse video of the West Front, Ex. 113, shows a deployment of the munition into the crowd at exactly that area and at that time. The government's attempt to say Mr. Cook lied about seeing such a munition deployment is simply incorrect.



*Figure 3*

Mr. Cook had only been to one other rally in DC and it was nothing like what unfolded at the Capitol that day. His curiosity and astonishment about the

police reaction that day, the large crowd assembled there and lack of knowledge about the restricted grounds made him think it was okay to stand witness to what was happening.   It should be noted that in 2020 - 2021 the media promoted and encouraged the notion that bad behavior by law enforcement was to be witnessed, documented and revealed– George Floyd's tragic murder by police was only discovered because some random citizen videotaped it and we all saw the truth. Mr. Cook was unsure, but believed he was potentially witnessing something wrong – so he stayed to see how things unfolded – and he takes responsibility for that choice.  Hindsight makes the best decision seem so obvious, but in real time, you don't always make the best decision because the best decision is not readily apparent until it's all said and done. Furthermore, just because Mr. Cook did not make the best decision, does not mean that he made the wrong decision intentionally. The evidence shows he was not actively participating in violence and was assaulted by not one but two other protesters forcing his entry into the tunnel. *See* admitted Gov ex. 507.1 at time stamp 16:19 (Antonio says "hey guys are you going in or not" and then grabs Mr. Cook by the neck and pushes him in) and at 20:04 when Mr. Cook is standing at entrance not moving until someone yells "Come on, come on" and he is rushed inside and pushed by man in blue hat and mask.    In the chaos of that day Mr. Cook himself fell victim to a vicious assault, his own fears and the bad decisions of others and like many others, in hindsight,

wishes he had not walked down to the Capitol with all the thousands of others after Trump's speech.

Remarkably, Mr. Cook did not post any social media on that day or any day thereafter. Since his conviction, he's lost his very good job and the apartment where he was living. What's critically missing from the evidence in this case, compared to other J6 cases, is that Mr. Cook never says or texts or emails anyone that says he was there to stop the vote, knew a vote was taking place or that he ever contemplated obstruction of the Electoral College Certification. He would never in a million years intentionally try to harm a police officer. In fact, it was never established at trial that Mr. Cook had the intent to interfere with the certification at all or intended to engage in civil disorder.[17]

Yet here he is, a non-violent, hard-working American - someone the government will argue before this Court should go to federal prison without taking into consideration the fact that he himself was assaulted first. For example, lawyers-lawyers who work for the FBI, that lie on applications for FISA warrants for political reasons, are not sentenced to prison in this Court-they get probation.

---

[17] After the events of January 6th, Mr. Cook did nothing but keep quiet and mind his own business in stark contrast to many other J6'rs whom this Court has sentenced. He didn't go on Tucker Carlson or any other show, Most importantly, he never will. What he did do was voluntarily turn himself in and give a statement to police and the FBI.

*See USA v. Kevin Clinesmith*, 20-CR-165 (JEB).[18]   Mr. Clinesmith-a lawyer-walked out of federal courtroom in this courthouse a free man without spending a day in prison. That's a disparity the size of Texas. That's not to suggest that this honorable Court should therefore give Mr. Cook a sentence of probation. No, no, no. What it says is that Mr. Cook should be punished for his conduct when taking into account all the facts of his particular conduct and no one else's. *See* Disparity, *infra.*

As the attached letters indicate, Mr. Cook is hardworking, kind, generous and law abiding. *See* Exhibit 2, letters.

The government must concede that he committed no violent acts and destroyed no property, even though he was in the proximity of others committing violence. He did not suit up for combat.  He did not obscure his face.  He was not armed.  He wore  clothing that was not designed for J6, but that he'd worn to work that day.  He carried a coconut thai chi water to the steps of the tunnel.

By the time Mr. Cook arrived at the U.S. Capitol, the barriers that had been erected along the perimeter of the building were no longer present. This was shown at trial.  He met no resistance in his walk up to the Capitol. At the time,  he didn't dream he'd be charged for protesting.

_____

[18] Our system of law needs to address this anger which our legal system is not really set up to address. The only people upset about the FBI lawyer getting probation were other lawyers. But when J6 defendants are sentenced it seems the whole world is upset.

He spoke to the officers and the FBI truthfully, freely and voluntarily and turned himself in. Without representation of counsel, he fully acknowledged his conduct by answering pointed questions by multiple FBI agents. He has never violated his conditions of release.   He did not post anything on social media or brag to friends after January 6.

This has obviously been a tough road for Mr. Cook and his family.   He has a very simple life: he worked hard as a statistician and tries at every turn to improve himself, support his family, and be a servant of God by volunteering.  It is of utmost importance to him that this Court and fellow citizens understand that he is incredibly saddened and remorseful about what took place on January 6, 2021. *See* Mr. Cook's letter, exhibit 2. People died, and law enforcement officers and protesters suffered multiple injuries. None of his actions will be erased from the internet. It's there forever.  He has been the subject of a number of media accounts lumping him with others that were violent, ruthless and well-orchestrated that were there on January 6, 2021 for violent purposes. His personal character and reputation will forever be tarnished.  He's lost the ability to work in a field that he was very good at and loved because of this felony conviction.  In sum, society has already punished him for his actions. It doesn't take a long prison sentence for one to feel remorse or learn from their mistakes.

In determining what punishment is warranted, this Court should not lose sight of the fact that he intended no harm, turned himself in voluntarily and has lived a life with no criminal conduct.  He has been a model of good behavior on pretrial and post-trial release. His past behavior and his post arrest behavior show that he is a very productive citizen and the Court can rely on that as a basis to sentence  him to a term of imprisonment under the guidelines and a term of supervised release of two years considering the 3553 factors.   Mr. Cook is fortunate. He has the support of his family. Many defendants that appear before this Court don't have that gift.

## B. Need for the Sentence imposed

### 1.  General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  He has already been severely punished as noted *supra.*  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that leaves a person unable to work when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon

those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to be counterproductive, and labeled as political posturing. A sentence within the guidelines, restitution and supervised release does constitute punishment and it will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms while on supervised release. He has been on pretrial release for nearly two years with many restrictions and has complied with them completely.

The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America 199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Cook's likelihood of recidivism is really non-existent. He has expressed genuine remorse and contrition. His acceptance of responsibility was swift, complete and without reservation and exercising one's constitutional right to go to trial should not be used against him. A felony conviction will change his life

forever. Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science panels… reached that conclusion, as has every major survey of evidence." *Id*.; *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),* summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The report, commissioned by the British Home Office, examined penalties in the United States as well as several European Countries. *Id*. at 1. It examined the effects of changes to both the certainty and severity of punishment. *Id.* While significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given his  current age, no criminal history and other issues consistent with what is mentioned above, the likelihood that he

would ever re-offend is as close to zero as one might come.[19] A punishment within the guidelines in this case is going to have the exact opposite effect than what is in the interest of justice.  Mr. Cook urges the Court to impose a sentence within the 0-6 month guidelines in light of his non-violent conduct at the Capitol, his immediate cooperation with the FBI, and the lack of a need to further deter him.

### 3.  Just Punishment

Mr. Cook now has a felony conviction which, in and of itself, is quite punitive.  The conviction  affects possible future job opportunities and will remain with him for the rest of his life.  He can't vote, serve on a jury or carry a gun. But supervised release will allow him to continue to work and support his community and continue the volunteering he does in his church and in his community.  If incarcerated for a long period of time, there will be only more suffering.

Given sentences imposed in comparative cases, a sentence slightly within the 0-6 month guidelines is not unusual and is  appropriate here. *See* Disparity, *infra*.

---

[19] For defendants in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* (May 2004).

And after one serves their time, there is supervised release to follow. This involves significant restraints on a defendant's liberty. Defendants must periodically report to the probation officer, permit the officer to visit their homes and jobs at any time, and follow the officer's rules of the road. *Jones v. Cunningham,* 371 US 236, 242 (1963). Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. *Ibid.* Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison again. *Ibid.* This Court makes that clear by having re-entry hearings for criminal defendants that appear in this Court. And experience of undersigned counsel shows that these hearings work.

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid.* They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid.* [Supervised release] significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid.*

A. <u>**The kinds of sentences available**</u>

A  guidelines sentence of between 0-6 months would  result in sentencing

disparity with other individuals who behaved similarly but were not similarly

charged.  That is, they behaved worse and were allowed to plead to misdemeanors.

*See infra*.

Imposition of a fine is discretionary, and, defendant respectfully submits, he

cannot pay a fine in this case since he has lost his income.

B. **The need to avoid unwarranted sentence disparities**

If this Court were to impose a sentence greater than the guideline range,

supervised release, community service, and/or restitution, it would create an

unwarranted sentencing disparity compared to similar cases that have already gone

to sentencing  or are pending in this Court.[20]  Paragraph 151 of the PSR states that

---

[20] For example, *United States v. Reeder,* 21 CR 166 (TFH). Critically, this J6
defendant pushed police officers and made contact with them yet the government
chose not to pursue those charges and he was given 3 months incarceration and
allowed to keep his class B misdemeanor deal. Here's what he posted: "was there
for over a half hour. I got gassed several times inside, many times outside the
Capitol. Got shot with peppers balls. Its fucking nuts. We had to battle the police
inside. It was crazy. Absolutely insane." *See* ECF No. 26, p.1. Later a group
unaffiliated with the government brought to their attention additional violent
conduct by Mr. Reeder, and the government asked to continue the sentencing
hearing. Ultimately, despite concrete evidence of violence, the government chose
not to bring additional charges. *See* ECF No. 33; 35, exhibit 1, power point, pages
30-41. Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-
5-ABJ (D.D.C. 2021). Leffingwell entered the Capitol Building. *Id.,* ECF No. 31,
p. 2. But "Leffingwell was not content to merely stand inside the threshold":
Positioned at the front of the line of rioters stacked hundreds deep behind him,
Leffingwell chanted at the officers standing before him to "join us!" in the rioters'
efforts to assault the Capitol. When some in the crowd shouted for the rest of the

the median length of imprisonment of defendants whose primary guideline was

2A2.4, is 16 months. This is incorrect as applied to J6 defendants. This statistic

includes all defendants, regardless of charge, involving completely different

circumstances and from other jurisdictions that were calculated under this same

guideline and same criminal history category. As this Court knows, each case must

stand on its own facts. In other cases that were prosecuted before other Judges of

this Court that included the 231 count and the misdemeanor counts, the following

---

crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll
never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel
Leffingwell and the gathering crowd, Leffingwell struck both officers in the head.
*Id.,* p. 2 (emphasis added). Specifically, Leffingwell "first punched Officer D.A. in
the head, and then as he continued to swing, he punched Officer W.H. in the head,
before eventually punching Officer D.A. once more." *Id.,* p. 8. His conduct was so
brazen that he was one of the few protesters arrested on the scene. *Id.,* p. 9.
Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government
sought a sentence of 27 months' incarceration. *Id.,* p. 2. The Court imposed a
sentence of six months' incarceration with credit for time served, followed by 24
months of supervised release. Cook's conduct was nowhere near this.
Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a
Confederate flag, Blair walked up to a police line outside the Capitol. He turned
towards an officer and said, "What's up motherfucker, what's up, what's up
bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the
defendant jabbed him with a lacrosse stick. *Id.* A search incident to arrest
recovered a knife in the defendant's backpack. 21-cr-186, ECF No. 55, p. 8. Blair
pled guilty to a § 231(a)(3) felony offense. This defendant was sentenced to five
months' incarceration. Just as in *Leffingwell,* Blair's acts could only be interpreted
as intended to inflict bodily injury or to threaten it.

are representative of how other judges have punished defendants: *U.S. v. Cortez*, 21 CR 317 (TSC) 4 months incarceration; *U.S. v. Ryals*, 21 CR 244(CKK) 6 months incarceration and 36 months S/R;[21] *U.S. v Cantwell*, 21 CR 89 (EGS) 5 months incarceration, 36 months S.R.; *U.S. v Grayson*, 21 CR 244 (TSC) 60 days incarceration, 24 months S.R.; *U.S. v. Genoatowski*, 22 CR 125(JMC) 60 days incarceration and 30 days home detention; *U.S. v Geoffrey*, 12 CR 197 (DLF) 6 months incarceration, and 12 months S.R.; *U.S. v. Adams* 22 CR 358 (BAH) 8 months incarceration and 36 months S.R.; *U.S. v. Rockholt*, 23 CR 104 (TNM) 5 months and 24 moths S.R.; *U.S. v. Stecher*, 21-CR-720(RDM)60 days incarceration, 24 months S.R*.; U.S. v. Konold*, 21-CR-160(TJK),60 days incarceration.

The sentence this Court  imposed on a co-defendant is instructive here. The Reyher couple (co-defendants) are a good starting point. As the Court will recall, this couple plead guilty to the 231 offense. The government asked for 9 months for Mrs. Reyher and she got 3 months. The government asked for 12 months for Mr. Reyher and he got 8 months. *See* minute entry 2/27/24. These sentences are important here because their conduct was far worse than Mr. Cooks conduct. And remarkably, both defendants were allowed to self surrender and were spared from the hell hole that it the D.C. Jail. (It's worth noting here that Mr. Cook's

---

[21] "S.R." stands for supervised release.

incarceration at the D.C. Jail, though disgusting and nearly impossible, garnered no attention in the press. He didn't ask his congressman or Margerie Taylor Greene to rescue him. He had avoided all the tricksters that hitch their trains to J6 defendants).

All 3 defendants were in the tunnel.[22] However, according to the statement of facts attached to Rehyler's plea agreement, ECF No. 87, and the government's sentence memo, ECF No. 153, Mr. Reyher encouraged other rioters to "push" and he entered the tunnel three times, as opposed to twice for Mr. Cook. *See Id,* p. 3. Mr. Cook never told anyone to push, in fact he angrily yelled at other rioters that were assaulting him. According to the government, Mr. Reyher "continued to fight the officer line." *Id.* He in concert with his wife remained at the front of the mob [in the tunnel] for a full six minutes. *Id.* at 9. This is twice as long as Mr. Cook. Also, they are next to the police line-they could reach out and touch the officers whereas Mr. Cook is at least 5-6 feet and 10 people behind this line. "Arthur Reyher made it face-to-face with the police line and thrust his body directly into police officers… and were "inches away" from the officer stuck in the door." *Id.* This is nicely illustrated in the government's sentence memo. He and his wife also yelled "our house" *Id.* They also "lock[ed] arms or bodies with each other as the

---

[22] Long before Mr. Cook's trial, this court took pleas from 3 other defendants in this case and read the government's sentence memo.

rioters-move[d] backwards in unison before rocking and pushing forward together." *Id.* at p. 12. "Arthur Reyher raised his hands and yelled to other rioters, "don't hit 'em! KEEP YOUR HANDS UP AND PUSH!" *Id.* at 13. Mr. Cook did not engage in any of this behavior. Incredibly, Reyher also showed other rioters how to do this. *See id.*, images at 17-18 and p. 14. He chanted "USA USA" and "our house." *Id.* Again, Mr. Cook did none of this. Reyhler also "patted rioters on the back as they entered the tunnel."[23] *Id.*

Finally, as if the above was not enough, "Reyher then again, rejoining the rioters at the mouth of the tunnel…encouraged rioters…yelled at the crowd, waved rioters toward the tunnel and passed a bullhorn to a rioter at the front of the police line. " *Id.* at p. 21. Again, Mr. Cook did nothing of the sort. The cases are not even close.

Consider the Court's own cases:

As for cases undersigned counsel has had in this Court in the past couple of years, this Court has varied downward on three distinct types of cases: *U.S. v. Earl Hamilton,* 20-245 (RBW) a fraud case where the defendant plead to credit card fraud involving misuse of funds from a non-profit, in this Court's words, "stealing money from babies." Mr. Hamilton received a sentence of 30 days. *U.S. v. Huwida Fadl,* 16-211 (RBW) a  complicated money laundering case where the client pled

---

[23] It appears Reyhler was in the tunnel from 2:43 pm and 3:21 pm and spent approximately hour there.

guilty and received a year and a day; and *U.S. v. Ken Watts*, 22-164(RBW) where the defendant pled guilty to drug offenses and he received a year and a day. After a cursory review of the sentences this Court has imposed in J6 cases no matter what the charge, this Court generally gives about half what the government recommends, with a couple of exceptions. As explained, every case is different and undersigned counsel is not going to tell this Court what he already knows about the defendants individually that have come before him and been sentenced by him. Suffice it to say that this Court can rely on Mr. Cook being obedient to each and every order of this Court as his history has indicated.

Mr. Cook's  culpability appears to be minimal in contrast with rioters who posted hateful messages, destroyed or stole government property and assaulted or threatened the law enforcement officers on that date.  These cases demonstrate that the sentence requested by the government is greater than necessary. Comparing Mr. Cook's behavior to the panoply of January 6 defendants, his conduct was  less serious than those who brought weapons with them and caused injury to officers. He also stands apart from many January 6 defendants in that he did not glorify or minimize his conduct after the fact.

## V. CONCLUSION

We are not asking that this Court let Mr. Cook off the hook for his bad conduct. He has been rotting in the D.C. Jail. Mr. Cook respectfully moves this

court to impose a sentence within  the  adjusted guidelines, 24 month's supervised release, 200 hours of community service,  and $2,000 restitution.  This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Cook as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

Respectfully submitted,


By:    /s/  *Kira A. West*
Kira Anne West
DC Bar No. 993523
712 H. St. N.E., Unit #509
Washington, D.C. 20005
Phone: 202-236-2042
kiraannewest@gmail.com


## CERTIFICATE OF SERVICE

I hereby certify on the 23rd day of August, 2024 a copy of same was delivered to the parties of record pursuant to the  rules of the Clerk of Court.

*Kira West*              /S/
Kira Anne West